Ronnie MONK, Plaintiff,

v.

John E. POTTER, Postmaster General, United States Postal Service, Defendant.

Action No. 4:09CV73.

United States District Court, E.D. Virginia.

July 15, 2010.

Edgar R. Jones, for Plaintiff.

George M. Kelley, III, for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on the motion to dismiss, or in the alternative, motion for summary judgment, filed by defendant John E. Potter, Postmaster General of the United States Postal Service ("Defendant"). The motion has been fully briefed and argued before the Court.

For the reasons stated below, the Court **GRANTS** summary judgment to Defendant, and the complaint is **DISMISSED WITH PREJUDICE.**

## I. Facts and Procedural History

As discovery in this case is complete, and, as discussed below, as there is no genuine issue as to any material fact, the Court will consider Defendant's motion as one for summary judgment. In doing so, the Court reviews "the pleadings, the discovery and disclosure materials on file, and any affidavits." Fed.R.Civ.P. 56(c). The Court also considers evidence from the Merit System Protection Board's formal record. *Rana v. United States,* 812 F.2d 887, 890 (4th Cir.1987) (holding that court may review evidence "created by the formal record before the [Merit System Protection Board]" when evaluating appeals from the Merit System Protection Board of discrimination claims).

### A. Background

Plaintiff Ronnie Monk ("Plaintiff" or "Monk") was employed by the United States Postal Service as a mail carrier at the Phoebus Station in Hampton, Virginia for twenty-four years until his termination on June 6, 2008. (Compl. ¶ 5, Docket No. 1; R. Monk. Dep., Att. 19, Docket No. 27.) At the Phoebus Station, as at other post office branches, each mail carrier is assigned a regular mail route to be completed in eight hours. Mail carriers receive overtime pay if they take longer than eight hours to complete their mail routes. (P. Beverly Decl. ¶ 7, Docket No. 27.) The carriers are required to review their mail daily and, if they believe the route will take longer than usual, obtain authorization for overtime prior to leaving the post office. If mail carriers go into overtime without obtaining prior authorization, they incur "unauthorized overtime." (P. Beverly Decl. ¶¶ 7–8.)

From October of 2006 through June of 2008, the period during which Monk claims he experienced unlawful discrimination, all of the mail carriers at the Phoebus Station were male,[1] with the exception of Ms. Rodriguez and Ms. Brooks, who were only employed at the Phoebus Station for a short part of the relevant time period. (P. Beverly Decl. ¶ 5; T. Grayer Decl. 27–28, Docket No. 34.) The Phoebus Station also had two temporary female employees, Ms. Bloom and Ms. Cook, who, in addition to other duties, substituted for mail carriers when the carriers were absent. (P. Beverly Decl. ¶ 4.)

In 2006, Congress enacted the Postal Accountability and Enhancement Act, Pub.L. No. 109–435, 120 Stat. 3198 (codified in scattered sections of 39 U.S.C.), which instituted reforms intended to make the Postal Service a profitable, competitive business. (L. Winmon Decl. ¶ 3, Docket No. 27.) In response, the Postal Service commenced efforts to reduce its overhead costs, including a campaign to reduce unauthorized overtime expense. This effort was unpopular with many Postal Service employees. (*Id.* at ¶ 10.)

### B. Postal Station Environment

In October of 2006, Pamela Beverly ("Beverly") transferred to the Phoebus Station to assume the Branch Manager position. (P. Beverly Decl. ¶ 1.) Beverly was particularly interested in cutting the branch's unauthorized overtime costs. (*Id.* at ¶¶ 3, 6.) She believed that unauthorized overtime was a wide-spread problem in the Postal Service and was used by postal employees to inappropriately generate additional income. (*Id.* at ¶ 10.)

---

1. The record does not provide the exact number of male mail carriers employed at the Phoebus Station from October 2006 through June 2008. However, it appears that there were at least six male mail carriers during this time period. (MSPB R., vol. I, Petition.)

Some of the mail carriers believed Beverly was a "tough" manager and disliked her management style. (MSPB R., vol. IV, Hr'g Tr. 12.) They considered her efforts to enhance efficiency to be harassing and intimidating. There were frequent confrontations and arguments at the Phoebus Station (T. Grayer Dep. 26.), and several of the employees found Beverly's communication style to be disrespectful. (R. Holly Dep. 29, Docket No. 34; T. Grayer Dep. 26. Docket No. 34; MSPB R., Hr'g Tr. 21–22.)

At least some of the male employees at the Phoebus Station believed that Beverly had an animus against men. (MSPB R., Hr'g Tr. 36–37; K. Douglas Dep. 48, Docket No. 34; R. Holly Dep. 17–18.) In 2007, Krystopher Douglas, a mail carrier, filed an EEO complaint against Beverly alleging sex discrimination, which complaint was resolved through mediation. (K. Douglas Dep. 12–13.) Some male employees perceived that Beverly frequently denied their vacation requests while readily granting female temporary employees days off for hair appointments or for family issues. (R. Holly Dep. 19.)

However, some female employees also had difficult relationships with Beverly. For example, at a Phoebus Station all-employee meeting, Beverly told Ms. Rodriguez publicly that she would be disciplined or terminated if she had additional unauthorized overtime violations, and Ms. Rodriguez transferred to another post office station soon thereafter. (R. Holly Dep. 12–13.)

## C. Disciplinary Actions

On February 18, 2006, prior to Beverly's arrival, Monk incurred unauthorized overtime and was issued a disciplinary Letter of Warning by Sherry Jordan–Taylor on March 4, 2006. (L. Winmon Decl. ¶ 11.) Monk filed a grievance with his Union concerning the discipline, and after Union mediation, the Postmaster agreed to remove the letter from his employment file on December 4, 2006, provided that Monk did not incur another unauthorized overtime violation prior to that date. (L. Winmon Decl., Att. 4.) However, because Monk did incur additional unauthorized overtime prior to December 4, 2006, the March 4, 2006 disciplinary letter was not expunged from his record. (L. Winmon Decl. ¶ 12.)

On November 28, 2006, after Beverly's arrival at the Phoebus Station, Monk incurred the unauthorized overtime that kept the March 4, 2006 disciplinary letter in his file, and he was issued a disciplinary Letter of Warning on December 18, 2006. (L. Winmon Decl., Att. 5.) On January 5, 2007, Monk was issued a third Letter of Warning for being tardy (arriving at work after 8:00 a.m.) on seven separate occasions and for not properly scheduling sick leave. (*Id.*, Att. 6.) On January 17, 2007, Monk incurred unauthorized overtime and, on February 1, 2007, was issued a Letter of Suspension, which is considered to be more serious than a Letter of Warning, but does not result in actual suspension of employment. (*Id.* at ¶ 14.) Then, on March 26, 2007, Monk was issued another Letter of Suspension for being tardy on four new occasions and for taking unauthorized sick leave. (*Id.* at ¶ 14.)

A mediation meeting involving Monk, a Union representative, and Postal Service management was held on April 27, 2007 to address Monk's disciplinary actions and an EEO complaint that he had filed in response to the discipline. (*Id.* at SI 15.) In addition to other provisions, Beverly and Postmaster Lucy Winmon agreed to change Monk's daily start time from 8:00 a.m. to 8:15 a.m., to expunge the February 1, 2007 Letter of Suspension from his employment file on October 27, 2007 if he incurred no additional unauthorized overtime violations, and to expunge the March

26, 2007 Letter of Suspension from his employment file on April 27, 2008. (*Id.* Att. 9.) Because Monk incurred additional unauthorized overtime violations, the February 1, 2007 Letter of Suspension was not expunged from his employment record. The March 26, 2007 Letter of Suspension was also still in Monk's employment file when he received his Notice of Removal on February 21, 2008, which was prior to the date on which the Letter of Suspension was to be expunged. (*Id.* at ¶ 19.)

On May 24, 2007, Monk failed to scan, for tracking purposes, electronically traceable mail, requiring the Postal Service to issue a refund to a customer who had paid a premium rate for the tracking service. (*Id.* at ¶ 16.) On June 18, 2007, he was issued a Letter of Warning for unsatisfactory performance. (*Id.*)

On October 5, 2007, Monk was issued a Letter of Suspension for being tardy on three occasions and for an unauthorized absence. (*Id.*, Att. 11.) Monk filed a grievance concerning the Letter of Suspension, and after Union mediation, the Postmaster agreed to expunge the Letter of Suspension from Monk's employment record on April 25, 2008, provided he did not incur additional similar infractions before that date. (*Id.*) The Letter of Suspension was still in Monk's employment file when he received his Notice of Proposed Removal on February 21, 2008. (*Id.* at ¶ 19.)

On January 21, 2008, Monk received a Letter of Suspension for three separate unauthorized absences. (*Id.* at ¶ 18.) Monk filed a grievance concerning the disciplinary action, and, after Union mediation, Beverly agreed to expunge the Letter of Suspension from Monk's employment record on March 6, 2008, provided he did not incur additional unauthorized absences before that date. (*Id.*) The Letter of Suspension was still in Monk's employment file when he received his Notice of Pro-

posed Removal on February 21, 2008. (*Id.* at 19.)

Despite his disciplinary record, Monk maintained that his performance was satisfactory. With regards to the unauthorized overtime, Monk contended that his mail route was too long to complete in eight hours. (R. Monk Dep. 59.) He based this assertion on an official inspection of his mail route in May of 2005, in which a Postal Service route inspector reported that it took her 8 hours and 38 minutes to complete Monk's route. (MSPB R., vol. IV, Hr'g Tr. 115–16.) After the inspection, Monk adopted the practice of daily submitting Form 3996 requests for overtime authorization to protect against possible discipline for unauthorized overtime. (MSPB R., Hr'g Tr. 23.) Monk believed that Beverly improperly tried to "conform [him] to the route, instead of the route conforming to the carrier." (R. Monk Dep. 59.) Also, at the end of each day, if Monk felt he needed to incur overtime in order to complete his mail route, he phoned his supervisors to obtain their approval to complete the route. (Monk Dep. 61.) Monk believed that this approval constituted authorization of his overtime (*Id.*), but his supervisors found this practice frustrating, as they had no choice but to direct Monk to complete his mail route once he had started. (P. Beverly St. 11; MSPB R., Hr'g tr. 32.)

There were no additional official inspections of the route, and the Postal Service did not make an official determination that Monk's route was too long for an eight-hour shift. (MSPB R., Hr'g tr. 20, 59, 117–18.) Furthermore, Monk's supervisors have testified that when Monk was absent, and other mail carriers substituted for him on his mail route, the substitute mail carriers were usually able to complete the route in eight hours. (MSPB R., Hr'g Tr. 9–10, 44.)

Concerning his tardiness, Monk asserted that he lived in Chesapeake, Virginia and was therefore required to cross the Hampton Roads Bridge Tunnel in order to reach the Phoebus Station. (R. Monk Dep. 92–93.) Monk asserted that he was often delayed because of traffic congestion and tunnel closings. (*Id.*) However, Monk's immediate supervisor, Robert Cook, has testified that he also lived on the other side of the tunnel, but did not have problems with tardiness. (MSPB R., Hr'g Tr. 12.)

### D. EEO Complaints

Monk filed numerous EEO complaints over the course of his employment. However, when Monk began filing these complaints, he did not understand that the EEO process was meant to protect employees from unlawful discrimination. (R. Monk Dep. 103.) Rather, he filed an EEO complaint whenever he had a grievance with a management decision that was not resolved to his satisfaction. (*Id.* at 46–47.) It appears that Monk's Union, at least implicitly, encouraged such EEO filings whenever Postal Service employees were unhappy with the outcome of mediation. (*Id.* at 54; L. Winmon Decl. ¶ 21.)

Monk filed several EEO complaints *prior* to the first disciplinary action taken against him in 2006. While copies of these complaints are not included in the record, and the record is unclear as to the exact dates of their filings, it does appear that in 2005, Monk filed an EEO complaint because he was not approved for a day off to attend a court proceeding involving his son. (R. Monk Dep. 48.) In another instance of unknown date prior to Monk's first disciplinary action in 2006, he filed an EEO complaint against a male supervisor because he "harassed" Monk by requiring Monk to appear at work on a day in which Monk's wife was hospitalized in an intensive care unit, but this complaint may have been withdrawn after mediation. (*Id.* at 52, 56.) Additionally, Monk filed an EEO complaint on an unknown date, before his first disciplinary action in 2006, in which he alleged harassment and retaliation because he was required to work overtime when he did not want overtime. (*Id.* at 47.)

After Beverly began her tenure at the Phoebus Station in October 2006, Monk filed four or five additional EEO complaints in response to the Letters of Suspension that he received. (R. Monk Dep. 46, 66–67.) Copies of these EEO complaints are not in the record. However, at oral argument, Plaintiff stipulated that in his EEO complaints, he did not check the box for an allegation of "sex discrimination," nor did he initially allege discrimination based on sex. Rather, Plaintiff checked either the boxes for "retaliation" or "harassment" as the basis for his EEO complaints. Postmaster Lucy Winmon asserts that these EEO complaints alleged "harassment." (*Id.* at 47; Decl. L. Winmon ¶ 21.)

### E. Petition

In February 2008, Robert Holly, a mail carrier, informed Monk that Robert Cook, a supervisor, had overheard Beverly expressing to a postal inspector a desire to "get rid of" Monk and two other employees. (R. Holly Dep. 22–23.) Robert Holly also told Monk that Robert Cook heard the postal inspector advising Beverly to "work on the biggest problem first, get rid of that person, and then continue down the line." [2] (*Id.*) Additionally, on several occasions, Robert Cook advised Monk to try to arrive at work on time, as "there [were] people watching him." (MSPB R., Hr'g tr. tr. 34.)

---

**2.** Robert Cook does not recall making these statements to Robert Holly. (MSPB R., Hr'g

34.) While the three employees allegedly targeted by Beverly had repeated unauthorized overtime violations (*Id.*), Monk inferred from these statements that he was being unfairly targeted by Beverly. (Pl. Resp., 10, Docket No. 31.)

On February 18, 2008, Monk collected letters written by himself and five other male letter carriers at the Phoebus Station, drafted a cover letter, and sent the collection of letters ("Petition") to several high level Postal Service managers. (MSPB Hr'g Tr. 142–44.) The letters contained complaints about Beverly's management style. In response to the Petition, the Postal Service conducted a "Climate Survey" of the Phoebus branch. (Hr'g tr. 100.) The results of the Survey were never revealed to the employees, and no changes were made to the work environment. (*Id.* at 101.)

### F. Termination

On February 1, 2008, in the midst of the targeting allegations described above, Monk again incurred unauthorized overtime. (L. Winmon Decl., Att. 1.) Monk claims that his mail was out-of-order that day, and that there was a severe rainstorm, both of which circumstances delayed him. (MSPB R., Hr'g tr. 131–32.) When he realized that he would not complete the route within eight hours, Monk telephoned his supervisor, Robert Cook, who instructed him to complete the route. (*Id.*) On February 21, 2008, the Postal Service issued Monk a Notice of Proposed Removal. (R. Monk Dep., Att. 17.) The Notice stated that such action was based on Monk's violation of the Employee and Labor Relations Manual ("ELM") Section 665.15, which requires employees to obey the instructions of supervisors, and ELM Section 665.13, which requires employees to "discharge their assigned duties conscientiously and effectively." (*Id.*) Upon receipt of the Notice, Monk amended his existing EEO case to allege, for the first time, sex discrimination. However, in a Final Agency Decision on March 10, 2008, the Postal Service denied Monk's EEO claim. (MSPB R. vol. I, Final Agency Decision.) After several meetings between Monk, his Union representatives, and Postal Service managers, Monk was terminated on June 8, 2008. (L. Winmon Decl. ¶¶ 6–7.)

### G. Administrative Proceedings

On September 22, 2008, Monk appealed the Postal Service's termination decision to the Merit System Protection Board ("MSPB"). After a hearing before an administrative judge, the MSPB issued an Initial Decision on December 8, 2008 affirming Monk's termination. (MSPB R., vol. III, Initial Decision.) Monk appealed the Initial Decision, which appeal was rejected in an April 24, 2009 Final Order by the MSPB. (MSPB R., PFR of Int., Final Order.)

## II. Standard of Review

### A. Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Stated another way, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir.2007). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered by a court in its determination. *Id.* at 248, 106 S.Ct. 2505.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the judge must construe the facts in the light most favorable to the non-moving party, and may not make credibility determinations or weigh the evidence. *Id.* at 255, 106 S.Ct. 2505; *Holland*, 487 F.3d at 213. However, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. MSPB Appeal

Federal district courts have jurisdiction to hear appeals from the MSPB when such appeals involve both nondiscrimination and Title VII discrimination claims. 5 U.S.C. § 7703(b)(2). The MSPB's determinations involving Title VII discrimination claims are reviewed de novo, but its determinations involving nondiscrimination claims are reviewed under an "arbitrary and capricious" standard. 5 U.S.C. § 7703(c).

▆ Notwithstanding the de novo nature of the district court's review of discrimination claims, the court may consider evidence from the MSPB's formal record.

*Chandler v. Roudebush*, 425 U.S. 840, 863–64, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) (noting that administrative record may be admitted "as evidence at federal-sector trial de novo"); *Rana*, 812 F.2d at 890 (holding that the court is "entitled to review all evidence in the trial de novo, both that newly introduced and that created by the formal record before the MSPB"); *Gordon v. U.S. Dept. of Navy*, 798 F.2d 469, *5 (6th Cir.1986)(unpublished)(noting that, on summary judgment under de novo standard, administrative record may be reviewed along with other evidence); *Simmons v. Marsh*, 690 F.Supp. 1489, 1491 n. 12 (E.D.Va.1988) (noting that evidence in administrative record is "pertinent on summary judgment" under de novo standard); *Jones v. United States Postal Serv.*, 78 F.R.D. 196, 200 (E.D.Mich.1978)(finding that "the administrative record, along with pretrial discovery and hearing in open court, may be the basis for a grant of summary judgment" under de novo standard). However, the Court may not allow the MSPB administrative judge's "factual findings to control the court's de novo review of the Title VII discrimination claims." *Young v. West*, 149 F.3d 1172, *5 (4th Cir.1998) (unpublished); *Oldham v. West*, 47 F.3d 985, 989 (8th Cir.1995). Nor may the Court's summary judgment review be based entirely on the evidence in the administrative record, without also considering the pleadings and pretrial discovery. *Gordon*, 798 F.2d at *5.

▆ With respect to nondiscrimination claims, the district court must:

> [R]eview the record and hold unlawful and set aside any agency action, findings or conclusions found to be—
>
> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule or regulation having been followed; or

(3) unsupported by substantial evidence. 5 U.S.C. § 7703. "The burden is on the appellant to prove [such] arbitrariness or capriciousness, procedural impropriety, or lack of substantial evidence." *Harris v. Dep't of Vet. Aff.*, 142 F.3d 1463, 1467 (Fed.Cir.1998).

### III. Discrimination Claims

#### A. Genuine Issue as to Material Fact

Plaintiff, arguing that summary judgment is improper, states that there are seventeen disputed, material facts that must be decided by a jury.[3] (Pl. Resp. 5–7, Docket No. 31.) The Court will address each allegation of disputed fact.

■ The following disputed "facts" identified by Plaintiff are conclusory statements of opinion rather than disputed "facts": 2) that disciplinary actions taken against Plaintiff were "causally related" to the arrival of Beverly; 6) that Plaintiff was harassed by Beverly; 9) that the termination decision was made without just cause; 10) that the MSPB Judge denied Plaintiff a fair hearing; 11) that the termination decision was "severe" and "egregious;" 15) that most of the disciplinary actions were the result of an overburdened route; and 17) that Plaintiff's mail route was too long for the allotted time. (*Id.*) These conclusory statements of opinion are insufficient to defeat the motion for summary judgment. *Erwin v. United States*, 591 F.3d 313, 319 (4th Cir.2010) (noting that a party "cannot create a material fact by reliance on conclusory allegations").

Furthermore, several of the "disputed" facts identified by Plaintiff are not actually in dispute. Plaintiff asserts in his disputed fact number 4) that "Plaintiff complained to many officials in 2007 and 2008" about his supervisors, "prior to most of the disciplinary actions." (Pl. Resp. 5.) However, this is not a disputed fact as the record is replete with evidence that EEO complaints and a Petition were submitted by Plaintiff in 2007 and in 2008, none of which has been denied by Defendant. Neither does Defendant deny Plaintiff's disputed fact number 7) asserting that Plaintiff's mail route had not been inspected since 2005; that on February 1, 2008, Plaintiff requested additional time before he left the post office; that the mail was out of sequence and that the weather was inclement on that day; that Plaintiff called his supervisor that afternoon to let him know that he would not finish his route on time; or that his supervisor then authorized him to continue delivering the mail. (*Id.* at 6.) Nor does Defendant dispute the following "disputed" facts numbered 12), asserting that Plaintiff was not offered training or assistance; 13), asserting that Plaintiff was never given "actual suspension or other remediation;" 14), asserting that Plaintiff was comparatively more regular in attendance after April 27, 2007; 16) asserting that Plaintiffs' colleagues believed he was being targeted by his supervisors; or 18) asserting that Plaintiff's customers were unhappy that he was terminated. (Pl. Resp. 7.)

■ Additionally, Plaintiff asserts as material, disputed fact number 8), that the Notice of Proposed Removal was not signed by the proper management official. (*Id.* at 6.) However, this fact, even if true, is immaterial to the question of whether Plaintiff suffered illegal sex discrimination. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")

Further, Plaintiff claims in disputed fact number 5) that Plaintiff followed all of the rules set out by "Postal regulations and Union agreements." (Pl. Resp. 5–6.) In

---

**3.** These facts are numbered 2–18 in Plaintiff's Response Brief.

support of this statement, Plaintiff offers the statement of Fritz Jones, President of the local office of the Union, that "Mr. Monk has met all the requirements of a letter carrier on February 21, 2008." (Def. Ex. 4 at 2, Docket No. 31.) However, the Court finds that this allegation is too nebulous to create a genuine issue of material fact sufficient to preclude summary judgment. For example, it is unclear whether Fritz Jones believes that Plaintiff did not actually commit the conduct alleged by the Postal Service, or whether he believes that such conduct is not contrary to "Postal Regulations and Union Agreements." Plaintiff has the burden to present specific facts that would create a triable matter for a jury. However, Plaintiff has only offered a broad, conclusory statement in disputed fact number 5). Furthermore, Plaintiff has offered no fact that counters Defendant's specific assertion that Plaintiff violated ELM Sections 665.13 and 665.15.

Finally, Plaintiff states in his disputed fact number 3) that several disciplinary actions should have been "expunged or purged" from Plaintiff's employment record. (Pl. Resp. 5.) However, Plaintiff does not identify which disciplinary actions should have been expunged from his employment record or explain why he believes that they should have been expunged. Nor does Plaintiff identify any portion of the record containing factual support for this claim. In fact, the only evidence on this point in the record is written agreements, signed by Plaintiff, which clearly state that Plaintiff's disciplinary actions would not be expunged if he continued to incur violations. Plaintiff has not provided "any significant probing evidence" to support his claim that disciplinary actions should have been purged from his record, and therefore has not met his burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505

(quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

Having addressed each of Plaintiff's seventeen assertions of disputed fact and determined that Plaintiff has failed to meet his burden to establish that there are genuine disputes as to any material fact, the Court proceeds to consider the effect of these findings on Defendant's motion for summary judgment.

### B. Title VII Framework

What has come to be known as "Title VII" in employment discrimination law was enacted as part of the Civil Rights Act of 1964, Pub.L. 88–352, 78 Stat. 241, in order to combat workplace discrimination. Title VII makes it "an unlawful employment practice for an employer ... to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). "[A] plaintiff may avert summary judgment and establish a claim for intentional sex ... discrimination through two avenues of proof.

■ "First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex ... discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004).

■ "The second method of averting summary judgment is to proceed under a 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment ac-

tion is actually a pretext for discrimination." *Id.* at 285. If a plaintiff can make a sufficient showing of the elements of the prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for plaintiff's discharge. *Holland,* 487 F.3d at 214. "This burden, however, is a burden of production, not persuasion." *Id.* If the employer *articulates* such a reason, the presumptive inference of discrimination drops from the case. *Id.* The plaintiff then must show that the articulated reason is a pretext for discrimination. *Id.* "In other words, the burden shifts back to [the plaintiff] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (citations omitted). Accordingly, this burden to demonstrate pretext "now merges with the ultimate burden of persuading the court that [the employee] has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. Stated another way:

> In *Reeves,* the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (internal quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

*Holland,* 487 F.3d at 214.

Plaintiff makes his discrimination claim under both the direct or circumstantial evidence framework and the *McDonnell Douglas* burden-shifting framework. Therefore, the Court will first consider whether Plaintiff has established a discrimination claim through direct or circumstantial evidence and, if not, consider whether Plaintiff has established a discrimination claim through the *McDonnell Douglas* burden-shifting framework.

## C. Direct or Circumstantial Evidence

 Although Plaintiff appeared to rely solely on the *McDonnell Douglas* burden-shifting framework in his brief, at oral argument he asserted that the record also contained direct evidence of a pattern of daily systematic harassment, of retaliation against Plaintiff for his EEO Complaints, and of discrimination against men. However, at oral argument, Plaintiff could not identify specific factual evidence, direct or circumstantial, supporting his contention that the Postal Service's adverse actions against him were wholly or partially driven by impermissible discriminatory motivations. Instead, Plaintiff described evidence tending to show his place of employment was a generally unpleasant place to work.

 However, to survive a motion for summary judgment on a Section VII claim, a plaintiff must produce evidence showing that his employer had some unlawful *discriminatory* motivation for an alleged adverse employment action or hostile environment. In this case, Plaintiff has not produced direct or circumstantial evidence, (such as statements by his supervisors that are generally discriminatory or statements by his supervisors that their actions were motivated by his sex) showing discriminatory motivation.[4] *See Evans v.*

---

**4.** A plaintiff may assert direct evidence by, for example, producing statements by the plain-

tiff's supervisor that unlawful discrimination

*Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir.1996) (finding no direct or indirect evidence of discriminatory motive where plaintiff offered only conclusory statements and no discriminatory statements by supervisors). Therefore, Plaintiff fails to overcome summary judgment on the basis of direct or circumstantial evidence, and the Court turns to Plaintiff's *McDonnell Douglas* burden-shifting arguments.

## D. McDonnell Douglas Framework

### 1. prima facie case

■ In setting forth the standard for employment discrimination cases brought under the *McDonnell Douglas* burden-shifting framework, the United States Supreme Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Accordingly, the United States Court of Appeals for the Fourth Circuit has developed elements of prima facie proof that vary depending on the type of discrimination

alleged by the plaintiff. Therefore, the Court will consider whether Plaintiff has met his burden of producing prima facie proof for each separate charge alleged in his complaint.[5]

### a. wrongful dismissal

In Count I, Plaintiff alleges that his "termination was motivated by discrimination on the part of his supervisor, Pamela Beverly, based on Plaintiff's gender." (Compl. ¶ 12.) The Fourth Circuit has held that in order to establish a prima facie case of discriminatory discharge, a plaintiff must show: 1) that he is a member of a protected class; 2) that he suffered from an adverse employment action; 3) that at the time the employer took the adverse employment action he was performing at a level that met his employer's legitimate expectations; and 4) that the position remained open or was filled by a similarly qualified applicant outside the protected class. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003).

■ In this case, both parties agree that there is no evidence in the record as

was the motive for an adverse employment action. A plaintiff may also assert circumstantial evidence by producing statements of the plaintiff's supervisor that are discriminatory, but require an additional inference in order to conclude that unlawful discrimination was the motivation for the specific, contested adverse employment action. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).

5. Defendant asserts, and Plaintiff agrees, that the elements of the prima facie case for each of Plaintiff's claims are: "(1) membership in a protected group, (2) the suffering of an adverse employment action and (3) treatment different from similarly situated employees outside of his protected group." (Def. Br. 19, Docket No. 27). In support, Defendant cites *Texas Dept. of Community Affairs v. Burdine*,

450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which does not actually support Defendant's statement of the elements of the prima facie case. Rather, *Burdine* sets forth the following elements for a prima facie case of racial discrimination: "1) that [the plaintiff] belongs to a racial minority; 2) that he applied and was qualified for a job for which the employer was seeking applicants; 3) that, despite his qualifications, he was rejected; and 4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.* at 254, n. 6, 101 S.Ct. 1089. Acknowledging the flexibility of the *McDonnell Douglas* framework, the Court nevertheless sees no reason to depart from the Fourth Circuit's established formulations of the elements of the prima facie case.

to the fourth element of the prima facie test for discriminatory discharge: whether or not Plaintiff's position has remained open or has been filled by a woman. Therefore, to the extent that Plaintiff seeks to bring a claim of discriminatory discharge, he has failed to meet his burden to establish a prima facie case. Accordingly, Count One is **DISMISSED WITH PREJUDICE.**

### b. discriminatory discipline

In Count II, labeled "Gender Discrimination," Plaintiff alleges that "[a]s a result of his gender as a man, he was subjected to multiple and repeated adverse employment actions in the form of daily harassment, disparate treatment in, regard to tardiness, overtime allowances, and unfair scrutiny." (Compl. ¶ 15.) The crux of the charge is that Plaintiff, because of his sex, was subjected to more stringent discipline in response to his tardiness and unauthorized overtime violations than were female employees, eventually leading to his termination. Therefore, this claim is most appropriately characterized as a "discriminatory discipline" charge.

 To establish a prima facie case of discriminatory discipline, Plaintiff must show: "1) that he is a member of the class protected by Title VII, 2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and 3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993). In satisfying the requirements of elements two and three, Plaintiff must show that the other employees outside the protected class were "similarly situated" in all respects. *Lightner v. City of Wilmington, North Carolina*, 545 F.3d 260, 265 (4th Cir.2008). For example, two employees who do not report to the

same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated. · *Id.*

There is no dispute here that Plaintiff meets the first element of the prima facie test: as a male, he is a member of a protected class. However, Plaintiff has not provided evidence sufficient to meet the second and third elements of the prima facie case.

 First, Plaintiff has not successfully identified similarly situated female employees whom he may use as comparators. At oral argument, Plaintiff stated that Ms. Cook, Ms. Bloom, and Ms. Brooks were similarly situated female employees who had been disciplined less harshly for similar infractions. However, Ms. Cook and Ms. Bloom were not mail carriers, as was Plaintiff, but temporary employees. Temporary employees, ·among other tasks, served as substitutes for the mail carriers when they were absent (P. Beverly ¶ 4.) and belonged to the same Union as did mail carriers. (T. Grayer Dep. 20.) However, the record contains no additional evidence, such as job descriptions or information about the line of supervision or workplace rules governing temporary employees, to establish that Ms. Cook and Ms. Bloom were similarly situated to Plaintiff. Therefore, Plaintiff, having the burden to produce such evidence, has failed to meet his burden to establish that Ms. Cook and Ms. Bloom were similarly situated to him.

Second, the record does not contain disciplinary records for the employees that Plaintiff claims were disciplined less severely. *See, e.g., Cook,* 988 F.2d 507, 510 (in discriminatory discipline case, court presented with disciplinary records of nine employees who had all violated the same rule). Therefore, the Court has no factual record of the other employees' infractions or of the discipline that they received.

■ Rather than referencing employment records, or other substantial evidence, Plaintiff cites to his deposition testimony for evidence that female employees were disciplined less severely than he was. (Pl. Br. 13.) At his deposition, Plaintiff stated that he learned from his union shop steward that Ms. Brooks incurred unauthorized overtime but was not disciplined for doing so. (R. Monk Dep. 32–33.) Also, Plaintiff stated that he believed that Ms. Cook was not disciplined for tardiness. (R. Monk Dep. 34–35.) Further, Plaintiff noted that Ms. Cook was not *immediately* terminated after a Postal Service vehicle that she was driving was in an accident (R. Monk Dep. 39.), although she was eventually terminated after she was involved in several other vehicular accidents. Additionally, Plaintiff asserted that his union shop steward informed him that Ms. Bloom had made a false statement in her employment application, but had not been disciplined for doing so.[6] (*Id.* at 39–40.) In summary, Plaintiff's deposition testimony, which he offers as factual evidence supporting his claims, consists of casual observations and workplace rumors. This evidence is second-hand, sparse and unreliable, and thus fails to meet Plaintiff's burden to show that his violations were comparable to those of similarly situated female employees or that he was disciplined more severely than similarly situated female employees. *See Greensboro Professional Fire Fighters Ass'n v. City of Greensboro,* 64 F.3d 962, 967 (4th Cir. 1995) (inadmissible hearsay in depositions and affidavits may not support or oppose summary judgment motion); *Riggs v. Air-Tran Airways, Inc.,* 497 F.3d 1108, 1121 (10th Cir.2007) (noting that statements conveyed to plaintiff were "second-hand" and inadmissible hearsay in opposition to summary judgment); *Lemmons v. Georgetown Univ. Hosp.,* 431 F.Supp.2d 76, 89–90 (D.D.C.2006) (purported events related by plaintiff in her own deposition were based on second-hand information rather than personal knowledge and were therefore inadmissible hearsay for summary judgment purposes); Fed.R.Civ.P. 56(e)(supporting or opposing summary judgment affidavits must be based on "personal knowledge").

Third, even if there were a showing that the three female employees identified by Plaintiff were similarly situated to him, and even if Plaintiff's allegations were substantiated by factual evidence, for the following reasons, Plaintiff still would not succeed in establishing a prima facie case for discriminatory discipline.

### (1) Ms. Cook

Plaintiff alleges that Ms. Cook was disciplined less seriously than he was because she was involved in several vehicular accidents prior to termination, indicating that Beverly was more willing to work with and accommodate Ms. Cook. However, even if the allegations regarding Ms. Cook are true, the infractions of unauthorized overtime and vehicular accidents are entirely different and not "comparable."[7] Further, the fact that Ms. Cook was not *immediately* terminated does not make her discipline less severe than Plaintiff's, as Plaintiff was not immediately terminated for his infractions either.

### (2) Ms. Bloom

Plaintiff alleges that because Ms. Bloom was not disciplined for an allegedly false statement in her employment application, she was disciplined less severely for a com-

6. Plaintiff expressed uncertainty as to the circumstances surrounding Ms. Bloom's alleged misstatement.

7. The Court acknowledges Plaintiff's point that the vehicular accidents would seem to be more serious infractions, but nevertheless finds that the lack of similarity between Ms. Cook's and Plaintiff's infractions makes an accurate comparison difficult.

parable offense. However, even if true, the infractions are clearly not comparable, as Ms. Bloom's alleged misstatement not only occurred prior to her employment at the Phoebus Station, but was different in kind than Plaintiff's unauthorized overtime violations. Furthermore, we have no evidence as to what the false statement involved, the age of the statement, or other relevant particulars.

### (3) Ms. Brooks

Plaintiff claims that Ms. Brooks also incurred unauthorized overtime, but, unlike Plaintiff, was not disciplined for doing so. However, the number of unauthorized overtime violations that Ms. Brooks allegedly incurred is unknown, and Plaintiff has failed to present such evidence. Plaintiff accumulated multiple unauthorized overtime violations, as well as tardiness infractions. An employer may, of course, reasonably discipline an employee who commits multiple infractions more severely than an employee who commits fewer of the same types of infractions. Although Ms. Brooks may have incurred unauthorized overtime, Plaintiff has not shown, or even alleged, that she incurred a number of violations similar to Plaintiff.

For these reasons, Plaintiff has not presented a prima facie case of discriminatory discipline and therefore Count Two of the complaint is **DISMISSED WITH PREJU-DICE.**

### c. retaliation

In Count Three of the complaint, Plaintiff alleges that Defendant terminated Plaintiff as retaliation for his filing EEO complaints against Beverly. (Compl. ¶¶ 17, 19.) At oral argument, Plaintiff asserted that Defendant had also terminated Plaintiff for coordinating the Petition.

■■■ Because Plaintiff has asserted no direct or circumstantial evidence of retaliation, he must proceed under the *McDon-*

*nell Douglas* burden-shifting framework, if at all. To make a prima facie case in the Fourth Circuit for retaliation under the burden-shifting framework, Plaintiff must show: "1) that he engaged in a protected activity; 2) [his employer] acted adversely against him; and 3) the protected activity was causally connected to the adverse action." *Holland,* 487 F.3d at 218.

■■■ "Protected activity" in a Title VII retaliation case "includes opposing discriminatory practices or participating in any manner in a Title VII investigation, proceeding, or hearing." *Prince–Garrison v. Maryland Dept. Of Health and Mental Hygiene,* 317 Fed.Appx. 351, 354 (4th Cir. 2009) (unpublished) (citing *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 552 (4th Cir.1999)). To be protected activity, the employee's complaints must be of an "unlawful employment practice or actions the employee reasonably believes are unlawful" violations of Title VII. *Id.* (citing *Jordan v. Alternative Resources Corp.,* 458 F.3d 332, 338–39 (4th Cir.2006)).

Here, for the following reasons, Plaintiff fails to meet his burden to prove a prima facie case for unlawful retaliation based on either the EEO complaints that he filed or the Petition that he coordinated.

### (1) eeo complaints

■■■ With regard to the EEO complaints, Plaintiff fails to meet the first element of the prima facie case: that the filing of the EEO complaints constituted protected activity. Plaintiff did file several EEO complaints prior to receiving the Notice of Proposed Termination, but the record does not contain copies of these EEO complaints. Although the filing of an EEO complaint would normally be protected activity, in this case, Plaintiff concedes that the EEO complaints he filed before receiving the Notice of Proposed Termination did not allege sex discrimination.[8]

---

8. After receiving the Notice of Proposed Removal, Plaintiff amended an existing EEO

Instead, when filing his EEO complaints, it appears that he selected "harassment" or "retaliation" as the bases for the EEO complaints. (R. Monk Dep. 47; L. Winmon Decl. ¶ 21.) However, Plaintiff's deposition statements indicate that he did not allege that such "harassment" or "retaliation" was based on his sex. Rather, the pre-Notice of Termination EEO complaints allege harassment in a general sense, without regard to sex, and retaliation for complaints that were not about sex discrimination. (R. Monk Dep. 46–57.) In fact, at least one of the EEO complaints was filed against a male supervisor. (*Id.* at 53.)

 Title VII does not prohibit retaliation against employees who do not allege unlawful discrimination. Although the EEO complaint process is meant to address unlawful discrimination, the evidence indicates that Plaintiff was not in fact using the process for its intended purpose. As Plaintiff's own statements indicate that he did not allege unlawful discrimination in his pre-Notice of Termination EEO complaints, and as such statements are not inconsistent with evidence in the record, Plaintiff fails to meet his burden to establish that he engaged in protected activity by complaining about unlawful discrimination.

### (2) petition

 Plaintiff also asserts that Defendant retaliated against him by issuing the Notice of Proposed Removal soon after he coordinated the Petition that led to the Climate Survey. However, Plaintiff again fails to show that the Petition constituted protected activity. Not one of the letters

in the Petition alleged unlawful discrimination or any other illegal behavior (MSPB R., vol. I, Petition.), as Plaintiff acknowledged at oral argument. Even if Defendant fired Plaintiff for coordinating the survey, Title VII does not forbid such non-discriminatory retaliation.

Plaintiff has therefore failed to assert a prima facie case for unlawful retaliation, and Count III of the Complaint is therefore **DISMISSED WITH PREJUDICE.**

### d. harassment

In Count IV of the Complaint, Plaintiff alleges a "hostile work environment through ... gender-based harassment." (Compl. ¶ 23.)

 Because Plaintiff has submitted no direct or circumstantial evidence of gender-based harassment, he must proceed under the *McDonnell Douglas* burden-shifting framework. To make a prima facie case in a burden-shifting framework based upon a hostile work environment claim, Plaintiff must show that there was: 1) unwelcome harassment; 2) based on a protected ground; 3) sufficiently severe or pervasive to alter the conditions of his employment; and 4) imputable to the employer. *Baqir v. Principi,* 434 F.3d 733, 745–46 (4th Cir.2006). In determining whether Plaintiff suffered from a hostile work environment, the Court considers the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift*

complaint to allege sex discrimination. (L. Winmon Decl. ¶ 21.) Because Plaintiff made this amendment *after* the alleged retaliation, it is not considered for the purpose of evaluating whether Defendant illegally retaliated against Plaintiff. *See Thompson v. Potomac*

*Electric Power Co.,* 312 F.3d 645, 651 (4th Cir.2002) (noting that to succeed on prima facie case of retaliation, plaintiff must show that "the adverse employment action took place after the filing of the discrimination claim").

*Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Here, there is no dispute that the alleged harassment by Beverly was imputable to the Postal Service. However, setting aside the question of whether there was indeed "unwelcome harassment" that was "sufficiently severe or pervasive," Plaintiff has failed to prove the second element of the prima facie case by producing facts showing that any unwelcome harassment he experienced was based on his *sex*. The record contains no factual evidence supporting such a contention, other than the statements of several Phoebus Station employees stating conclusory assertions that they believed Beverly had an animus against men. (MSPB R., Hr'g Tr. 36–37; K. Douglas Dep. 48; R. Holly Dep. 17–18.) The closest that the record comes to such factual evidence is Plaintiff's deposition statement that Beverly did not "harass" Ms. Cook when she came to work late, although she did do so when Plaintiff was late to work. (R. Monk Dep. 34.) However, the record contains assertions that female employees, such as Ms. Rodriguez, were also subject to "harassment" by Beverly. (T. Grayer Dep. 27–28; R. Holly Dep. 29.) Therefore, Plaintiff has not made a showing that any alleged unwelcome harassment was based on a protected ground.

Moreover, Plaintiff can not meet his burden to present a prima facie case for a hostile work environment by showing that his workplace environment was generally unpleasant for all employees, regardless of their sex. In order to constitute a violation of Title VII, the hostile work environment must have been related to discrimination against a protected class. As Title VII is not a "general civility code for the American workplace," it does not prohibit all disrespectful workplace behavior. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Plaintiff has not met his burden to show that any harassment was sexually motivated, and therefore he has failed to present a prima facie case for a hostile work environment. Therefore, Count IV of the complaint is **DISMISSED WITH PREJUDICE.**

### 2. defendant's legitimate nondiscriminatory reason and plaintiff's pretext claim

As discussed above, under the *McDonnell Douglas* framework, if an employee establishes a prima facie case for discrimination (which Plaintiff has failed to do), the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action. *Hill*, 354 F.3d at 285. If the defendant meets its burden to proffer a legitimate, non-discriminatory reason, the plaintiff must then prove by a preponderance of the evidence that the defendant's stated reasons were not its true reasons, but were a pretext for discrimination. The plaintiff may meet this burden by presenting evidence that his employer's proffered reasons are not worthy of belief, thereby enabling the jury to infer that discrimination was the real reason for the adverse action, or by presenting evidence that discrimination was, in fact, the employer's real reason. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). However, in seeking to meet this burden, a plaintiff "may not recast an employer's legitimate, non-discriminatory reason or substitute his business judgment for that of the employer, but must instead meet each reason head on and rebut such reason." *Miller v. Locke*, No. 1:08–cv–1149, 2009 WL 1675486, *5 (E.D.Va. June 12, 2009) (unpublished)(citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000)). Therefore, it is irrelevant whether the employer was correct in its assessment of an

employee's performance, so long as its assessment was, in fact, the true reason for its termination decision. *Id.*

Assuming, for the sake of argument, that Plaintiff had made a prima facie showing (which he has not), the Court will briefly address the application of the evidence to this burden-shifting framework. The employer's burden to proffer a legitimate nondiscriminatory reason at this stage is a burden of production, not a burden of persuasion. *Holland,* 487 F.3d at 214. Here, Defendant meets its burden by producing depositions and declarations stating that Plaintiff repeatedly incurred unauthorized overtime and tardiness infractions and that any disciplinary actions and perceived "targeting" of Plaintiff were a result of those infractions. Therefore, even if Plaintiff had met his burden of establishing a prima facie case of discrimination, Defendant has refuted such prima facie case by proffering a legitimate non-discriminatory reason for Plaintiff's termination, and any prima facie inference of discrimination would then disappear from the case. The burden would then shift back to Plaintiff to prove by a preponderance of the evidence that Defendant's stated reasons were not its true reasons, but were a pretext for discrimination. To do this, Plaintiff must "prove '*both* that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington Coll.,* 57 F.3d 369, 378 (4th Cir.1995) (citations omitted).

In support of his pretext argument, Plaintiff argues that Defendant accumulated in Plaintiff's record a series of inconsequential "paper actions" and then abruptly terminated him for a minor infraction, bypassing intermediate steps such as actual suspensions. He further submits that his mail route was too long to complete in eight hours, but Defendant refused his requests for inspections of his route. Fur-

thermore, Plaintiff contends that several of his disciplinary letters and actions should have been expunged from his employment file, and because this was not done, Plaintiff's disciplinary record was unduly voluminous.

Such proffered evidence from Plaintiff does not establish pretext. First, as explained in detail above, Plaintiff has not established that discrimination was the actual reason for any of Defendant's contested actions. Simply stated, Plaintiff has not produced facts tending to show that Defendant was motivated by Plaintiff's sex when it disciplined him, allegedly harassed him, or terminated him.

Second, the fact that previous unauthorized overtime violations had only resulted in "paper" disciplinary actions does not support Plaintiff's contention that his February 1, 2008 unauthorized overtime violation could not have been the motivation for his termination. Plaintiff had accumulated multiple violations and had participated in several mediation meetings in which the parties attempted to resolve the matter of Plaintiff's continued infractions, and there is no evidence to suggest that Defendant did not finally conclude that Plaintiff had committed one too many violations.

Third, in response to Plaintiff's argument that Defendant refused his requests to inspect the length of his route, Beverly has testified that postal regulations prohibited her from obtaining an inspection of Plaintiff's mail route (MSPB R., Hr'g tr. 59–60.), and Plaintiff has produced no evidence to counter this contention. Furthermore, regardless of whether the mail route was allegedly too long for Plaintiff to complete in eight hours, the fact that other employees were able to complete it in eight hours indicates that the Phoebus Station management had a reasonable basis to believe that Plaintiff should have been able to complete the route in eight hours.

Fourth, in response to Plaintiff's assertion that disciplinary letters and actions should have been expunged from his record, the Court notes that on several occasions Defendant agreed to expunge the records of Plaintiff's disciplinary action. However, such agreements were on condition that Plaintiff not commit any additional violations within a specified time. Plaintiff has produced no evidence to counter Defendant's evidence of disciplinary violations, or to show that Plaintiff met the conditions for expungement, or to otherwise indicate that expungement of his disciplinary record was appropriate.

In summary, Plaintiff has not met his burden to show a prima facie case giving rise to an inference of unlawful discrimination. Furthermore, even if Plaintiff had met this burden, Defendant has met its burden to produce a legitimate non-discriminatory reason for the adverse employment actions, and Plaintiff has not provided sufficient evidence to support a finding of pretext.

### IV. MSPB Review

Plaintiff appeals the MSPB Administrative Judge's decision to allow only four of Plaintiff's thirteen proposed witnesses to testify at the MSPB hearing. As discussed above, the Court reviews actions of the MSPB under an arbitrary and capricious standard.

 Administrative judges presiding over MSPB hearings may appropriately choose to exclude proposed witnesses. Such "[p]rocedural matters relative to discovery and evidentiary issues fall within the sound discretion of the board and its officials," and will not be overturned unless there is a clear and harmful abuse of discretion. *Curtin v. Office of Pers. Mgmt.*,

846 F.2d 1373, 1378–79 (Fed.Cir.1988). Therefore, "[t]he presiding official is authorized to rule on witness lists, i.e., to exclude witnesses whose testimony is considered to be irrelevant, immaterial, or repetitious." *Tiffany v. Dept. of Navy*, 795 F.2d 67, 70 (Fed.Cir.1986).

In this case, the Administrative Judge issued an Order on October 27, 2008 in which she directed the parties to file a statement of facts and issues and a list of witnesses with a summary of their expected testimony. (MSPB R., vol. II, Order and Notice of Hearing and Prehearing Conference 2.) The Administrative Judge warned the parties that they would not be allowed to present evidence at the hearing that was not raised at the prehearing conference, except for good cause shown. (*Id.* at 3.) After receiving submissions from both parties and following the prehearing conference, the Administrative Judge noted that the Plaintiff had provided no direct or circumstantial evidence of gender discrimination, and therefore such an allegation would not be considered at the hearing. (MSPB R., vol. III, Summary of Prehearing Conference 2–3.) Further, the Administrative Judge stated that Plaintiff alleged that his termination "violated unspecified provisions of the collective bargaining agreement," but she would not consider this argument at the hearing unless Plaintiff filed "copies of any provision that allegedly was violated along with a specific description of the alleged violation" by November 10, 2008. (*Id.* at 3–4.) On November 10, 2008, Plaintiff filed a document which did not cite any regulations or bargaining agreement provisions that had allegedly been violated and did not include copies of any such provisions allegedly violated.[9] (MSPB vol.

---

9. The document listed ten "severe and pervasive willful violations of both Agency regulations and policies, as well as against the Agreement with the National Association of

Letter Carriers Union," but did not actually identify any such regulations and policies. (MSPB vol. III, App. Resp. to Order and

III, App. Resp. to Order and Mem. in Support of the Appeal.) Therefore, the Administrative Judge did not allow evidence at the hearing concerning violations of the collective bargaining agreement. (MSPB R., vol. III, Summary of Prehearing Conference. 4.) Thus, the sole issue for resolution at the hearing was whether Plaintiff's termination was in retaliation for filing the EEO complaints and the Petition. (*Id.* at 3.)

After identifying the issue for the hearing, the Administrative Judge approved Plaintiff's witnesses Krystopher Douglas, Victoria Speed, Ronnie Monk, and Robert Cook to testify. (*Id.* at 4.) The expected testimony of Plaintiff's remaining proposed witnesses was excluded because it "was not shown to be relevant and material to the issues and/or because their expected testimony was shown to be cumulative." (*Id.*)

■ Having reviewed the MSPB record, the Court finds that the Administrative Judge's decision to exclude certain of Plaintiff's witnesses was not an arbitrary and capricious decision. Two of Plaintiff's proposed witnesses, Thomas Grayer and Robert Holley, were expected to testify to statements made by Beverly that the witnesses had not actually heard. (MSPB vol. III, App. Response to Order.) Not only would such testimony have been unreliable double hearsay and thus rightfully excluded, but it was also cumulative, as two witnesses, Krystopher Douglas and Robert Cook, testified as to Beverly's alleged statements.[10] *See Tiffany,* 795 F.2d at 70 (upholding MSPB administrative judge's decision to exclude witnesses where plaintiff failed to show that their testimony would "be other than repetitious testimony"); *Sanders v. United States Postal Serv.,* 801 F.2d 1328, 1331 (Fed.Cir.1986)(noting that hearsay evidence may be admissible in an administrative hearing only "if there are circumstances which give it credibility and probative value to a reasonable mind"); *Murphy v. Dept. of Navy,* 89 Fed.Appx. 702, 705 (Fed.Cir.2004) (unpublished) (finding MSPB administrative judge's exclusion of testimony proper where "it would plainly be hearsay and thus inadmissible").

■ Several of Plaintiff's other proposed witnesses—Martha Peterson, Bill Logren, Corey Allen, William Taylor, and Branson Dunn—were to testify to the overall environment at the Phoebus Station and Beverly's harassment of Plaintiff. (MSPB vol. III, App. Response to Order.) This testimony was irrelevant to the issue of unlawful retaliation and appropriately excluded because it had no bearing on whether Plaintiff was disciplined because he filed the EEO complaints and the Petition. *See Guise v. Dept. of Justice,* 330 F.3d 1376, 1379–80 (Fed.Cir.2003)(finding it within MSPB administrative judge's discretion to exclude witnesses whose proposed testimony was irrelevant to specific issue to be considered at the administrative hearing). Another proposed witness, David Goodwin, a mail carrier who did not work at the Phoebus Station, was to testify that Postmaster Lucy Winmon allowed other Postal Service employees with "overtime problems" to continue working.

Mem. in Support of the Appeal.) For example, the first item in the list stated in its entirety "1. Violation of Out–of–Adjustment Route 6308, Since May 2005: The Appellant's Route, # 6308 was inspected on May 24, 2005 by Vickie Speed and found to be out of adjustment by some 38.49 minutes. This has been ignored!" The remaining items on the list were similar in style to the first.

10. Robert Cook testified that he did not remember such alleged statements by Beverly. (MSPB R., Hr'g tr. 34.) Krystopher Douglas's testimony was found to be unreliable double hearsay. (*Id.* at 108.)

(MSPB vol. III, App. Response to Order.) This evidence was not clearly relevant to the issue of retaliation as there was no showing the proposed witness had direct knowledge of such facts, and the Administrative Judge was within her discretion to exclude such evidence. *See Guise*, 330 F.3d at 1380 (upholding MSPB administrative judge's exclusion of witnesses where plaintiff did not provide a "more specific showing" that the exclusion deprived plaintiff of "important evidence").

■ Finally, Fritz Jones, a Union representative, was expected to testify that Plaintiff's termination violated the collective bargaining agreement and postal regulations. (*Id.*) However, the Administrative Judge had already determined that this allegation would not be considered at the hearing because Plaintiff had not properly raised it at the prehearing conference or in a timely submission following the prehearing conference. *See Richards v. Fed. Deposit Ins. Corp.*, 125 Fed.Appx. 303, 304 (Fed.Cir.2005) (unpublished)(holding that issues not raised by plaintiff at prehearing conference could not be raised at MSPB hearing). Therefore, Fritz Jones's testimony was irrelevant, and the Administrative Judge was within her discretion to exclude it. *See Guise*, 330 F.3d at 1379–80.

In summary, Plaintiff has not met his burden to show arbitrariness or capriciousness, procedural impropriety, or lack of substantial evidence. Therefore, the decision of the MSPB is **AFFIRMED**.

### V. Miscellaneous Motions

Defendant has filed a motion for leave to respond (Docket No. 43.) to Plaintiff's Exhibits 1 and 2, which were filed with the Court at oral argument. These exhibits consisted of the Petition and the cover letter to the Petition.

Plaintiff's motion is moot because these documents were already a part of the MSPB record (MSPB R. vol. I, Petition.)

and thus had already been submitted to the Court. *See Rana v. United States*, 812 F.2d 887, 890 (4th Cir.1987). These documents contain unsworn statements, and therefore the Court has not considered them as evidence in ruling on the motion for summary judgment. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.") Therefore, the motion for leave to respond (Docket No. 43.) is **DENIED**.

Plaintiff's first motion to compel discovery (Docket No. 16.) and supplemental motion to compel discovery (Docket No. 17.) are **DENIED** for the reasons set forth by Magistrate Judge Miller in his March 31, 2010 Order denying Plaintiff's Motion to Extend Discovery Deadlines (Docket No. 22.).

■ Defendant moves to seal the MSPB record on the basis that it contains Plaintiff's personal identifiers and that redaction of such personal identifiers is not practical. (Docket No. 19.) Although the Court has discretion to seal court documents "if the public's right of access is outweighed by competing interests, the presumption in such cases favors public access." *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir.2000). Therefore, "before a district court may seal any court documents, ... it must (1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." *Id.*

■ Local Civil Rule 7(C)(1) requires the redaction of personal identifiers in court pleadings, documents, and exhibits. In this case, redaction of Plaintiff's person-

al identifiers can be accomplished without sealing the entire MSPB record, as the number of pages in the record containing personal identifiers is not too numerous to make such redaction practical.[11] Therefore, the MSPB record (Docket No. 20.) will be stricken from the record, and Defendant shall re-file the record within ten days of the date of this order with all appropriate redactions.

## VI. Conclusion

In conclusion, Defendant's motion for summary judgment (Docket No. 26.) is **GRANTED,** Defendant's motion for leave to respond (Docket No. 43.) is **DENIED,** Plaintiff's first motion to compel discovery is **DENIED** (Docket No. 16.), Plaintiff's supplemental motion to compel discovery is **DENIED** (Docket No. 17.), and Plaintiff's motion to seal (Docket No. 19.) is **DENIED.** The Clerk is **DIRECTED** to strike the MSPB record (Docket No. 20.) and return such record to Defendant's counsel, and Defendant is **ORDERED** to re-file the MSPB record with all appropriate redactions within ten days of the date of this Order. Plaintiff's complaint (Docket No. 1.) is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

11. The Court identified thirty-three separate pages in the MSPB administrative record that contained personal identifiers, which is less than 10% of the pages in the record. As the MSPB record does not contain numbered pages, the Court is unfortunately unable to direct Defendant's attention to these pages.