Affirmed by published opinion. Judge MOTZ wrote the majority opinion, in which Judge KEELEY joined. Senior Judge HAMILTON wrote a dissenting opinion.
OPINION
DIANA GRIBBON MOTZ, Circuit Judge:
This appeal arises from the district court’s imposition of personal liability on Charles Erwin for payroll withholding taxes owed by GC Affordable Dining, Inc. (“GCAD”). Erwin owned a one-third interest in GCAD and served as a GCAD corporate officer and director, and, on behalf of GCAD, selected business sites, hired and fired employees, and negotiated and personally guaranteed loans and other contracts for the company. The district court held as a matter of law that Erwin (1) was responsible for payment of these taxes and (2) willfully failed to pay them. Erwin challenges both holdings on appeal. For the reasons that follow, we affirm.
*317 I.
Over the last 25 years, Erwin, a North Carolina entrepreneur, has owned or operated at least 60 restaurants. In June 1994, Erwin joined with three other North Carolina businessmen — Geoffrey Grenert, Stephen Coggin, and John Miracle — to form GCAD, a franchisee of Golden Corral Franchising System, Inc. (“Golden Corral”). GCAD eventually opened and operated five Golden Corral restaurants.
At GCAD’s founding, Erwin and Grenert each owned one third of the corporate stock; Coggin and Miracle each owned one sixth of the stock. Shortly thereafter, Grenert left the enterprise; eventually, Miracle sold his interest in GCAD to Mark Cole. But at all times, Erwin retained at least a one-third interest in the company.
In addition to owning all of the corporate stock in GCAD, Erwin and his partners served as its directors and officers. Coggin served as president, Miracle (and later Cole) as vice president, and Erwin as vice president, secretary, and treasurer.[1] The partners hired two managers to oversee day-to-day operations, payroll, and accounting.
In early 1995, Erwin and his partners— along with their wives — personally guaranteed construction and operating lines of credit with First Union Bank for GCAD. Erwin and his partners also secured a construction line of credit for a corporation, Tiffany, LLC, which they established as a flow-through real estate holding company for GCAD. Tiffany leased or purchased land and equipment for the restaurants; GCAD, in turn, leased the land and equipment from Tiffany.
Erwin participated in selecting sites for the restaurants and signed lease-related documents for all restaurant locations on behalf of both Tiffany and GCAD. Erwin also personally guaranteed rent payments on at least four of the leases, and personally guaranteed lines of credit from food vendors for the benefit of the GCAD restaurants.
Despite early profits, the GCAD restaurants soon began to lose money. In January 1997, Erwin and his partners decided to fire one of the original day-to-day managers and consolidate operations under the other. Erwin expressly acknowledged his “involve[ment]” in both decisions. During 1997, Erwin conferred at least weekly with Coggin regarding GCAD’s affairs. Moreover, Erwin and his partners met monthly during 1997, and at least quarterly in 1998, to discuss GCAD matters. In an effort to improve business, Erwin also visited the GCAD restaurants and met with store managers during 1997 and 1998.
Unfortunately, business did not improve. GCAD had a negative operating cash flow of $2 million by the end of 1997, and thus had difficulty paying its creditors. In early 1998, Erwin and Coggin negotiated a payment plan to settle GCAD debts owed to one food vendor, LoPresti, with whom Erwin had personally guaranteed GCAD’s line of credit.
During this period, Erwin and his partners decided to replace the remaining original manager with William Pintner, a seasoned Golden Corral employee. On a weekly basis, Pintner and Erwin discussed sales figures and strategies to increase profits.[2] Early in Pintner’s tenure, he rec *318 ommended that the partners fire their accountant and hire Barry and Buddy Light (the “Light brothers”) to handle accounting and payroll for GCAD; the partners followed this advice.
Despite these efforts, GCAD continued to lose money. In December 1998, Erwin and his partners learned that the Light brothers had failed to pay the entire quarterly payroll tax withholdings for the third quarter of 1998. The partners made a capital call for approximately $150,000 and wired the money to the Light brothers with instructions. Erwin, who contributed $95,000 of the $150,000, testified that he personally instructed the Light brothers “that absolutely under no circumstances whatsoever were [the Light brothers] ever to be late with any taxes.” Despite Erwin’s admonition, the Light brothers failed to pay in full the payroll taxes for the fourth quarter of 1998.
Coggin testified that in late 1998, he and Erwin also sent the Light brothers $50,000 for additional payment to the favored food vendor, LoPresti, and instructed the Light brothers not to pay the rent because Erwin and Coggin themselves would handle the rent payments directly. Erwin never testified to the contrary.
Also in late 1998, Erwin became involved in negotiations — which became final in May 1999 — to release GCAD from obligations under one of its leases. The landlord, seeking to terminate the lease to accommodate another party, agreed to wire $1.65 million to CNL American Properties Fund, Inc. (“CNL”), a company financing GCAD’s restaurant building and equipment, to cover rents GCAD owed CNL on that and other leases. At that time GCAD — and Erwin as personal guarantor — owed CNL substantial rental payments.
GCAD’s financial condition continued to worsen throughout 1999, and GCAD did not pay in full its withholding taxes for the first three quarters of that year. In August 1999, Erwin and his two partners learned of this latest delinquency. In December 1999, the partners made another capital contribution of $50,000 to help cure these deficiencies, but GCAD never paid the taxes in full. Nevertheless, Erwin and his partners continued to employ the Light brothers.
In February 2000, Erwin and his partners finally fired the Light brothers. After doing so, Erwin decided to take control of GCAD accounting functions, including payroll. He moved GCAD’s financial operations from Ohio to the North Carolina offices of his solely owned company, Chelda. After that time, GCAD remained current on its payroll withholding payments. In late 2000, Erwin became the 100 percent owner of GCAD; shortly thereafter he dissolved the corporation. Between August 1999 and the close of business in 2000, the GCAD restaurants generated approximately $5 million in sales revenue. Rather than paying the outstanding 1998 and 1999 tax deficiencies, however, GCAD continued to pay rent and supplier expenses. Erwin acknowledged that, pursuant to his direction, GCAD paid its landlord and suppliers rather than the IRS; he maintained that GCAD did so because this was the only way to remain in business.
Following the demise of GCAD, the IRS assessed tax deficiencies against Erwin in the amount of the unpaid payroll withholding taxes owed by GCAD. Erwin paid a portion of the assessed amounts and then brought this action against the United *319 States to recover those amounts. The Government counterclaimed for $264,579, the amount of GCAD’s unpaid deficiencies from the fourth quarter of 1998 and the first three quarters of 1999, plus interest. The United States subsequently filed third-party complaints against Coggin, Pintner, and the Light brothers.
The parties filed cross motions for summary judgment. The district court, adopting the recommendation of the magistrate judge, denied Erwin’s motion and granted the Government’s. The court also granted the Government’s motions to issue a final judgment against Erwin and stay the proceedings against Coggin, Pintner, and the Light brothers pending the outcome of Erwin’s anticipated appeal.
Erwin timely noted this appeal.
II.
The Internal Revenue Code requires employers to withhold social security and federal excise taxes from their employees’ wages. See 26 U.S.C. §§ 3402(a), 3102(a) (2006); Plett v. United States, 185 F.3d 216, 218 (4th Cir.1999). The employer holds these monies in trust for the United States. 26 U.S.C. § 7501(a) (2006). Accordingly, courts often refer to the withheld amounts as “trust fund taxes”; these monies exist for the exclusive use of the government, not the employer. See Plett, 185 F.3d at 218. Payment of these trust fund taxes is “no[t] excusefd]” merely because “as a matter of sound business judgment, the money was paid to suppliers ... in order to keep the corporation operating as a going concern — the government cannot be made an unwilling partner in a floundering business.” Collins v. United States, 848 F.2d 740, 741-42 (6th Cir.1988).
The Code “assure[s] compliance by the employer with its obligation ... to pay” trust fund taxes by imposing personal liability on officers or agents of the employer responsible for “the employer’s decisions regarding withholding and payment” of the taxes. Slodov v. United States, 436 U.S. 238, 247, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978) (interpreting 26 U.S.C. § 6672 (2006)). To that end, § 6672(a) of the Code provides that “[a]ny person required to collect, truthfully account for, and pay over any tax ... who willfully fails” to do so shall be personally liable for “a penalty equal to the total amount of the tax evaded, or not ... paid over.” 26 U.S.C. § 6672(a). Although labeled as a “penalty,” § 6672 does not actually punish; rather, it “brings to the government only the same amount to which it was entitled by way of the tax.” Turnbull v. United States, 929 F.2d 173, 178 n. 6 (5th Cir.1991) (internal quotation marks omitted).
Personal liability for a corporation’s trust fund taxes extends to any person who (1) is “responsible” for collection and payment of those taxes, and (2) “willfully fail[s]” to see that the taxes are paid. Plett, 185 F.3d at 218; O’Connor v. United States, 956 F.2d 48, 50 (4th Cir.1992). Once the Government assesses a taxpayer for this liability, the taxpayer has the burden of proof at trial on both elements of § 6672 liability. See O’Connor, 956 F.2d at 50.
But we review de novo a district court’s grant of summary judgment to the Government, resolving all disputed facts in favor of the taxpayer. See O’Connor, 956 F.2d at 50. Of course, to defeat summary judgment, the taxpayer (like any other litigant) must identify an error of law or a genuine issue of material fact; the taxpayer cannot create a material fact by reliance on conclusory allegations or bare denials. See Fed.R.Civ.P. 56(c), (e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Bouchat v. Balt. Ravens Football Club, *320 Inc., 346 F.3d 514, 522 (4th Cir.2003). Moreover, a material fact is one “that might affect the outcome of the suit under the governing law.” Anderson, 477 U.S. at 248, 106 S.Ct. 2505.
“[I]n the absence of disputed material facts, summary judgment represents a favored mechanism to secure the ‘just, speedy, and inexpensive determination’ ” of taxpayer liability under § 6672. Plett, 185 F.3d at 223 (quoting Fed.R.Civ.P. 1); see also Barnett v. IRS, 988 F.2d 1449, 1454 & n. 10 (5th Cir.1993) (stating that, although the facts in a § 6672 analysis are critical, “extensive caselaw ... narrowly constrains a factfinder’s province in § 6672 cases,” and noting that for this reason “countless courts have found responsibility [for purposes of § 6672] as a matter of law”).[3]
With these principles in mind, we turn to Erwin’s contention that the district court erred in holding, as a matter of law, that Erwin (1) was a person responsible for the payment of GCAD’s withholding taxes, and (2) willfully failed to pay those taxes. We consider each argument in turn.
III.
Although the Code defines a responsible person as one “required to collect, truthfully account for, and pay over any tax,” 26 U.S.C. § 6672(a) (emphasis added), the Supreme Court has interpreted this language to apply to all “persons responsible for collection of third-party taxes and not ... [only] to those persons in a position to perform all three of the enumerated duties.” Slodov, 436 U.S. at 250, 98 S.Ct. 1778. Thus, the Code deems anyone required to “collect” or “account for” or “remit” taxes a “responsible person” for purposes of § 6672. See Plett, 185 F.3d at 219.
More than one person may be held responsible for a corporation’s payroll taxes. Indeed, “[t]he term ‘responsible person’ is broad and may include many individuals connected with a corporation.” O’Connor, 956 F.2d at 50; see also Barnett, 988 F.2d at 1455 (“[T]here usually are ... multiple responsible persons in any company.”). Assessing whether a “person has the statutorily imposed duty to make the tax payments” constitutes the “key element” in determining responsible person status. O’Connor, 956 F.2d at 51. “This duty is considered in light of the person’s authority over an enterprise’s finances or general decision making[,] ... [and] is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disbursement of funds.” Id. (citation omitted).
Titular authority alone does not establish responsible person status. Rather, the proper inquiry focuses “on substance rather than form.” Id. “The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, or is under a duty to do so, before that officer can be deemed to be a *321 responsible person.” Id. Put another way, the essential inquiry is whether a person has significant, but not necessarily exclusive, authority over corporate finances or management decisions. See Plett, 185 F.3d at 222; see also Kinnie v. United States, 994 F.2d 279, 283-84 (6th Cir.1993).
We have developed a non-exhaustive list of factors to consider in determining whether “the substance of the circumstances” establishes responsible person status under § 6672. Thus, we examine whether the employee (1) served as an officer or director of the company; (2) controlled the company’s payroll; (3) determined which creditors to pay and when to pay them; (4) participated in the corporation’s day-to-day management; (5) had the ability to hire and fire employees; and (6) possessed the power to write checks. Plett, 185 F.3d at 219; see also O’Connor, 956 F.2d at 51. No single factor controls; rather, we consider the “totality of the circumstances.” See Vinick v. United States, 205 F.3d 1, 8 (1st Cir.2000); see also Barnett, 988 F.2d at 1455; O’Connor, 956 F.2d at 51.
In this case, the undisputed facts demonstrate that Erwin was a “responsible person” for § 6672 purposes with respect to GCAD’s payroll taxes. While not every Plett factor so indicates, most do. Moreover, the totality of the circumstances conclusively establishes that Erwin had the “effective power” to pay the taxes owed by GCAD. Barnett, 988 F.2d at 1454.
As to the first factor, it is undisputed that Erwin founded and served as an officer of GCAD. In fact, Erwin continually served as secretary, treasurer, vice-president, and director of the corporation throughout its existence and, at all times, owned at least a one-third interest in GCAD. Although Erwin asserts that he acted as a mere “passive investor!] who contributed capital and [only] held the title[s] to protect his interest in the venture,” the evidence establishes that in fact his involvement in GCAD was substantial. Erwin was the only GCAD owner with any experience in the restaurant business, and he himself acknowledged in deposition his active involvement in corporate decisions.
With respect to the second factor, although Erwin and his two partners did not directly manage GCAD’s payroll, they exercised substantial supervisory authority over the management team — Pintner and the Light brothers — who did control payroll. Moreover, Erwin conceded that he participated in setting financial policy for GCAD and, on occasion, directed payment of GCAD’s withholding taxes. See Kinnie, 994 F.2d at 284 (stating that a taxpayer need not “always exercise his powers” to remain responsible for seeing that withholding taxes are paid, and “may not escape liability by delegating the task of paying over the taxes to someone else”).
Furthermore, within months of learning of GCAD’s tax deficiencies, Erwin took complete control of GCAD’s financial operations, which establishes his authority to do so. Erwin himself had no doubt as to his authority over the company’s payroll, testifying that, had he learned of the Light brothers’ failures to remit payroll withholding taxes during the first quarter of 1999, “a lot of things would have happened differently.” Erwin testified that he would have taken remedial action at that time, noting that “as soon as [he] did find out” about the deficiencies, “[he] did bring all the accounting back to [his] office.” Although Erwin did not seize control of GCAD during the tax periods at issue here, his subsequent exercise of authority over all of GCAD’s financial operations certainly “cast[s] light on” the question of whether he was “a responsible person” during those periods. Vinick, 205 F.3d at 11 n. 8.
*322 With respect to the third factor, the undisputed facts demonstrate that Erwin, along with Coggin, indeed determined, on more than one occasion, which GCAD creditors to pay and when to pay them. In January 1998, Erwin and Coggin negotiated a payment plan with a food vendor, LoPresti, to pay debt owed by GCAD on a line of credit, which Erwin had personally guaranteed. Later in that same year, Erwin and Coggin infused $50,000 into GCAD, directing more payments to LoPresti and (according to Coggin and undisputed by Erwin himself) took over the rent payments to CNL, a GCAD landlord whose rent payments Erwin had also personally guaranteed. Moreover, from December 1998 through May 1999, Erwin, along with Coggin, negotiated a buy-out of one of GCAD’s leases, which resulted in an additional payment of $1.65 million to CNL to cover rent owed on that and other leases.
Thus, during the tax periods at issue, Erwin actively negotiated substantial payments to GCAD creditors on lines of credit and loans, some of which he had personally guaranteed. Erwin’s personal guarantees of these lines of credit and other debts do not alone establish his status as a responsible person. But the undisputed evidence that Erwin negotiated payments to these preferred creditors offers additional strong support for the conclusion that he “use[d] his authority over financial affairs” of GCAD. O’Connor, 956 F.2d at 51. In this way, he again acted as a “responsible person” for purposes of § 6672 during the tax periods in question.
GCAD’s dealings with the IRS further demonstrate Erwin’s control over the company’s financial priorities. In December 1998 and again in December 1999, Erwin and his partners infused capital into GCAD and explicitly directed the Light brothers to use that money to pay back taxes. Erwin testified that he personally instructed the Light brothers to stay current with GCAD’s payroll withholdings.[4] Erwin also testified that in 2000, when GCAD had significant revenues, he made the business decision to keep the restaurants’ doors open by paying the landlord and suppliers instead of paying the back taxes that GCAD owed from previous years.
As to the fourth factor, Erwin did not play the most active role in the day-today management of the corporation during the relevant tax periods; rather he delegated much day-to-day authority to others. But, of course, “delegation will not relieve one of responsibility.” Purcell v. United States, 1 F.3d 932, 937 (9th Cir.1993); see also Kinnie, 994 F.2d at 284. Moreover, the undisputed facts establish that Erwin did involve himself in the company’s general decision making and never was, as he claims, a mere passive investor. Cf. O’Connor, 956 F.2d at 51-52 (finding question of fact as to responsible person status when “passive investor” did not exercise authority in managing the company, did not dictate the financial decisions of the company, and had no authority to do so).
Erwin helped to choose sites for the corporation’s restaurants, negotiated and signed leases and other contracts on behalf of the corporation, personally guaranteed lines of credit and rent payments for the corporation, met with its restaurant managers, and involved himself in negotiating payment plans and buy-outs with corporate creditors. Thus, albeit to a lesser extent than others, Erwin participated in *323 the day-to-day management of the corporation.[5]
Consideration of the fifth factor — hiring and firing power — also demonstrates that Erwin was a “responsible person” for § 6672 purposes. Erwin himself acknowledged that he was involved in the hiring and firing of both sets of accountants and of all upper-level management. Indeed, in early 2000 Erwin took full control of the company’s operations and ultimately made the decision to close GCAD. Of course the latter conduct did not occur during the tax periods in issue, but it is nonetheless relevant in establishing that Erwin was a consistently active presence in important personnel decisions at GCAD during its entire existence.
With respect to the sixth factor, we agree with Erwin that the record does not demonstrate that he had check-writing authority for GCAD during the relevant tax periods. Although this factor weighs in favor of Erwin, we must consider it in the “totality of the circumstances.” See Vinick, 205 F.3d at 8; see also Barnett, 988 F.2d at 1455; O’Connor, 956 F.2d at 51. Those circumstances include inter alia Erwin’s exercise of authority over GCAD’s finances by directing certain payments to privileged creditors during the tax periods in question, and taking over GCAD’s day-to-day financial operations and exercise of ultimate check-writing authority immediately after the tax periods in question. Taken together, the undisputed facts of the case clearly evidence that during the relevant tax periods Erwin had the power to exercise check-writing authority had he chosen to do so. Compare Plett, 185 F.3d at 222 (finding “financial control ... indisputably in the hands of [the taxpayer]”), with Vinick, 205 F.3d at 11 (explaining that determining responsibility goes to “the central question of power” and emphasizing that “[a]t no time did [the taxpayer] exercise any decision-making authority over which creditors [the corporation] paid”).
Although in some cases questions as to responsible person status under § 6672 cannot be resolved at summary judgment, see, e.g., O’Connor, 956 F.2d at 51-52,[6] in *324 this case they surely can. Given the undisputed facts here, we can only conclude that the Government demonstrated Erwin’s responsible person status as a matter of law.
We note that other courts have reached precisely the same conclusion in considering similar facts. See, e.g., Jefferson v. United States, 546 F.3d 477, 481 (7th Cir.2008) (holding board president responsible person as a matter of law because he secured loans and directed past payment of taxes for the corporation, reviewed financial reports, and had check-signing authority); Thosteson v. United States, 331 F.3d 1294, 1299-1300 (11th Cir.2003) (holding corporate officer and stockholder a responsible person as a matter of law even though he had “limited check writing authority, up to only $750, without a countersignature”); Taylor v. IRS, 69 F.3d 411, 417 (10th Cir.1995) (holding corporate director and officer a responsible person as a matter of law because he “possessed sufficient control over corporate finances, had authority to borrow funds and write checks and thereby had the ‘effective power’ to pay the taxes” (quoting Barnett, 988 F.2d at 1454)); Greenberg v. United States, 46 F.3d 239, 243-44 (3d Cir.1994) (holding in-house controller a responsible person as a matter of law even though he took instructions from the controlling stockholder and “feared for his job were he to independently issue a check for the [tax] delinquency”); Kinnie, 994 F.2d at 284 (holding corporate vice president and fifty-percent shareholder a responsible person as a matter of law because he had check-signing authority, hired an accountant to review the books, and eventually took control of the business); Mazo v. United States, 591 F.2d 1151, 1156 (5th Cir.1979) (holding corporate stockholders, officers, and directors responsible persons as a matter of law even though others handled all day-to-day operations and prepared all corporate checks).
Erwin’s contention that others in the company may have been just as, or even more, responsible for GCAD’s failure to remit payroll taxes during the tax periods in issue does not free him from § 6672 liability. For § 6672 imposes liability on “all responsible persons, not just ... the most responsible person.” Turnbull, 929 F.2d at 178. Erwin’s own admissions conclusively demonstrate that he was a responsible person for § 6672 purposes during the relevant tax periods.
To summarize, Erwin admitted that at all times he owned at least one third of the stock of this closely-held corporation and served as its secretary, treasurer, vice president, and director. Erwin admitted that he signed loan documents and leases on behalf of the corporation, thus evidencing that he shared responsibility for establishing the corporation’s financial policy. Erwin admitted that he approved restaurant site selection and regularly reviewed sales data. Erwin admitted holding quarterly meetings with his partners and weekly telephone calls with the general manager to discuss the restaurants. Erwin admitted that he directed or negotiated payments to certain favored creditors to reduce GCAD debt, which he had personally guaranteed. Erwin admitted that he hired and fired upper-management employees, including GCAD’s accountants. Finally, although Erwin delegated many of the day-to-day financial responsibilities of the corporation *325 to others, he admitted that he infused capital into GCAD and admonished the Light brothers, over whom he had significant control, to stay current with the company’s tax obligations.[7]
In short, the undisputed facts — indeed Erwin’s own admissions — demonstrate, as a matter of law, that Erwin was a responsible person under § 6672 during the relevant tax periods.
IV.
Having found Erwin a “responsible person,” we turn to whether he “willfully” failed to collect, account for, or remit payroll taxes to the United States. Plett, 185 F.3d at 219. This inquiry focuses on whether Erwin had “knowledge of nonpayment or reckless disregard of whether the payments were being made.” Id. (quoting Turpin v. United States, 970 F.2d 1344, 1347 (4th Cir.1992)). A responsible person’s intentional preference for creditors other than the United States establishes willfulness as a matter of law; such an intentional preference occurs when the responsible person knows of or recklessly disregards an unpaid deficiency. Id.; Turpin, 970 F.2d at 1347.
By the end of 1998, Erwin knew that GCAD had financial difficulties. Indeed, in December 1998 Erwin made a special capital contribution to pay a tax delinquency from a prior quarter. At that time, Erwin also admonished the Light brothers to make timely payments in the future, but he did not monitor the situation personally to ensure future payment, nor did he advise the Light brothers to implement additional internal controls.
Although Erwin’s lack of oversight in all likelihood contributed to the Light brothers’ failure to remit payroll taxes for the fourth quarter of 1998 and the first three quarters of 1999, the record, viewed in the light most favorable to Erwin, does not support a finding — as a matter of law— that prior to August 1999 Erwin had actual knowledge that the Light brothers continually failed to pay GCAD’s payroll taxes. Thus, whether Erwin acted willfully during this time, as a matter of law, depends on whether he acted with “reckless disregard” of GCAD’s tax obligations. See Turpin, 970 F.2d at 1347.
Erwin claims that he thought that the Light brothers would obey his instruction to stay current with GCAD’s tax obligations, that Coggin was monitoring the Light brothers, and that the Light brothers were professionals with experience accounting for Golden Corral restaurants in the past. Arguably, a fact finder fully crediting this testimony might conclude that Erwin’s actions, although negligent, did not rise to the level of recklessness. See id. at 1347 n. 4 (“Mere negligence in failing to ascertain facts regarding a tax delinquency ... is insufficient to constitute *326 willfulness under [§ ] 6672(a).” (internal quotation marks omitted)).
Even assuming, however, that Erwin did not act willfully prior to learning of the full extent of the tax deficiencies in August 1999, his conduct after that point unquestionably evidences willfulness as a matter of law. During the third quarter of 1999, GCAD paid just a fraction of its payroll tax liability. Although Erwin and Coggin each made capital contributions to cover the deficiency in December 1999, GCAD still owed over $100,000 for that quarter alone and had not satisfied deficiencies from 1998 and the first two quarters of 1999. The record does not conclusively reveal the extent of Erwin’s actual knowledge at this point in time, but certainly demonstrates that by that time he was on notice that GCAD owed substantial payroll taxes to the IRS. Yet Erwin and his partners continued to rely on the Light brothers to address the problem for several more months. Erwin’s failure to assess and remedy the payroll tax deficiencies immediately upon learning of their existence in August 1999 constitutes unreasonable willful conduct. Cf. id. at 1350 (noting the relevance of responsible person’s immediate action to address deficiencies upon learning of them). This is particularly so given that, at Erwin’s direction, GCAD paid other creditors during this period. Thus, Erwin is liable for any outstanding third-quarter 1999 deficiencies. See Plett, 185 F.3d at 219.
Moreover, following the lead of every other circuit to consider the question, we adopt the rule that when a responsible person learns that withholding taxes have gone unpaid in past quarters for which he was responsible, he has a duty to use all current and future unencumbered funds available to the corporation to pay those back taxes. See, e.g., Thosteson, 331 F.3d at 1300-01; United States v. Kim, 111 F.3d 1351, 1357 (7th Cir.1997); Honey v. United States, 963 F.2d 1083, 1089 (8th Cir.1992); Mazo, 591 F.2d at 1157. Pursuant to this rule, as of August 1999, Erwin had a duty to use all unencumbered funds to reduce GCAD’s tax liability from the prior quarters.
The record demonstrates that GCAD generated several million dollars in gross receipts after August 1999 and paid rent and food vendors with those funds instead of paying the IRS. (Erwin does not contend that any creditor held a security interest in these funds superior to the IRS’s interest. See Honey, 963 F.2d at 1090.) Accordingly, we hold that, by preferring GCAD’s other creditors to the IRS, Erwin willfully failed to remit GCAD’s payroll taxes for the fourth quarter of 1998 and the first three quarters of 1999.[8]
V.
For the reasons set forth above, the judgment of the district court is

AFFIRMED.

. In his original IRS claim, Erwin did not acknowledge his service as treasurer of GCAD. In deposition, however, he conceded that he had held that position.

. Pintner testified in deposition that he spoke to Erwin daily regarding sales and the performance of individual stores, and that Erwin visited the stores every month or two. Pintner further testified that Erwin directed the *318 payment of GCAD’s bills. As to the latter claim, in deposition, Erwin neither admitted nor expressly denied Pintner’s testimony, testifying only, "I can’t say whether I ever [directed payment of bills]. I know it was not a practice.”

. See generally C.T. Drechsler, Annotation, Construction, Application, and Effect, with Respect to Withholding, Social Security, and Unemployment Compensation Taxes, of Statutes Imposing Penalties for Tax Evasion or Default, 22 A.L.R.3d 8, § 4 & Supp. (1968) (collecting cases in which courts have found responsibility for § 6672 purposes as a matter of law); Edward A. Nolfi, Annotation, When Are Persons Other Than Owners, Directors, Officers, and Employees Potentially Liable for Penalties Under IRC § 6672 (26 U.S.C.A. § 6672), Concerning Failure to Collect and Pay Over Tax, 84 A.L.R. Fed. 170, §§ 3-31 & Supp. (1987) (same).

. In deposition, Erwin maintained that the Light brothers withheld information, making it difficult to monitor GCAD's finances. It is undisputed, however, that Erwin had the authority to demand financial information and to fire the Light brothers, as he ultimately did.

. Notably, Erwin’s involvement in the regular affairs of the company increased when Pintner came on board in early 1998, as Erwin went from communicating monthly with the prior manager to having weekly discussions with Pintner regarding sales figures. Cf. Vinick, 205 F.3d at 5 (noting taxpayer, deemed not to be a responsible person, became less involved in the affairs of the corporation during the non-payment periods).

. Erwin mistakenly places heavy reliance on O'Connor, in which the taxpayer, although a fifty-percent owner of the corporation, did not dictate any of the company’s financial decisions or set its financial policy, did not decide which creditors should be paid, did not participate in any of the company’s operational management, and did not hire or fire employees. See O’Connor, 956 F.2d at 51. Rather, in stark contrast to Erwin’s active role in GCAD, the taxpayer in O'Connor merely provided the operational cash for the company and received periodic financial reports. Id. Our friend in dissent (who authored O’Connor) does not similarly contend that O'Connor assists Erwin.
Rather, the dissent heavily relies on Vinick, a First Circuit case that Erwin never cites. Given that Vinick’s corporate involvement primarily occurred outside of the tax periods in question and decreased significantly during the relevant periods, when his partner unilaterally took control of the company’s day-today financial management, the First Circuit held Vinick was not a responsible person. In contrast, the undisputed facts here demonstrate Erwin was actively involved in GCAD's financial affairs and general management decision making throughout the corporation's entire existence. Notably, unlike Vinick, Erwin directed or negotiated payments to corporate creditors to reduce debts he had personally guaranteed. That Erwin ultimately took complete control of the corporation’s finances after the tax periods in question does exactly what Vinick acknowledged such evidence *324 could do, i.e. "cast light on [his] status as a responsible person” during those tax periods, 205 F.3d at 11 n. 8, because it demonstrates his authority, at all times, to dictate financial decision making. Erwin even admitted at deposition that had he learned of the tax deficiencies earlier, he would have taken remedial action at that time.

. Despite making these and other admissions in deposition, Erwin maintains that we must accept as true his contradictory averments in a later-filed affidavit, in which he claims in conclusory fashion that during the tax periods at issue he had no role in managing GCAD or any control over its financial affairs. Reply Br. at 2. The dissent also appears to embrace this view, relying on Erwin's later "sworn statement” as creating an asserted factual dispute with Erwin's prior sworn deposition testimony. Such reliance is misplaced; “[i]t is well established that '[a] genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of [a party's] testimony is correct.’ ” Halperin v. Abacus Tech. Corp., 128 F.3d 191, 198 (4th Cir.1997) (quoting Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984)); accord Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 341 (4th Cir.2001); S.P. v. City of Takoma Park, Md., 134 F.3d 260, 273 n. 12 (4th Cir.1998) (noting that a party’s "later denial” of earlier "statements does not create a genuine issue of a material fact”).

. Erwin raises a putative "reasonable cause” defense, arguing that GCAD had to use gross receipts to pay rent and vendors in order to stay operational. Courts that have recognized this defense have limited it to situations in which circumstances outside a taxpayer’s control have thwarted his reasonable efforts to protect trust funds, and have not applied it in situations where the taxpayer made a conscious decision to pay other creditors. See, e.g., Thosteson, 331 F.3d at 1301 (citing Logal v. United States, 195 F.3d 229, 233 (5th Cir.1999)); see also Greenberg, 46 F.3d at 244 ("It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States.”). Thus, even were we to conclude that a "reasonable cause” defense to § 6672 liability exists, such a defense would not protect Erwin under these facts.