**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1609

GARY ADAMS,

       Plaintiff – Appellant,

  v.

AMERICAN OPTICAL CORPORATION; MINE SAFETY APPLIANCES COMPANY,

       Defendants – Appellees,

  and

COAST HOLDINGS, INCORPORATED; 3M COMPANY, as successor by merger to Minnesota Mining and Manufacturing Company and/or its predecessors/successors in interest,

       Defendants.

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap. James P. Jones, District Judge. (2:16-cv-00027-JPJ-JMS)

Argued: September 8, 2020                  Decided: November 6, 2020

Before KING and FLOYD, Circuit Judges, and Thomas S. KLEEH, United States District Judge for the Northern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Floyd wrote the opinion, in which Judge King and Judge Kleeh joined.

**ARGUED:** Michael Blair Martin, MARTIN WALTON LAW FIRM, Houston, Texas, for Appellant. Milton Trent Spurlock, DINSMORE & SHOHL LLP, Louisville, Kentucky; Carol Dan Browning, STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellees. **ON BRIEF:** Bethany A. Breetz, STITES & HARBISON, PLLC, Louisville, Kentucky; Chad M. Eggspuehler, TUCKER ELIS LLP, Cleveland, Ohio, for Appellees.

_____

FLOYD, Circuit Judge:

Plaintiff-Appellant Gary Adams appeals from a district court order entering summary judgment in favor of Defendants-Appellees American Optical Corporation (AO) and Mine Safety Appliances Company (MSA) (collectively, "Defendants").[1] Defendants moved for summary judgment on the sole basis that Virginia's two-year statute of limitations barred Adams's state-law personal injury claims. Thus, the only question before this Court is whether Adams filed his personal injury suit outside the two-year limitations window.

## I.

### A.

Between 1981 and 2014, Adams worked as a coal miner, which exposed him to harmful coal dust. During that period, Adams was given and wore respirators allegedly produced by Defendants to protect himself from inhaling excessive amounts of that dust. Adams contends that these respirators failed to protect him from lung disease that he developed by inhaling coal dust, while Defendants argue his illness developed outside the statute of limitations. We begin with a review of Adams's medical history.

---

[1] Adams voluntarily dismissed his claims against Defendant 3M Company. *See* Order of Voluntary Dismissal of 3M Co., *Adams v. Am. Optical Corp.*, No. 2:16-cv-00027 (W.D. Va. Apr. 22, 2019), ECF No. 81. Claims against Defendant Coast Holdings Incorporated were later dismissed by oral order of the court. Oral Order, *Adams v. Am. Optical Corp.*, No. 2:16-cv-00027 (W.D. Va. May 17, 2019), ECF No. 110.

To promote the early detection of mining-related illnesses, the National Institute for Occupational Safety and Health (NIOSH) administers a program that gives free x-rays to coal miners. These x-rays are reviewed by NIOSH-certified B-readers who look for any abnormalities in a miner's lungs.[2] However, NIOSH does not use these x-rays to formally diagnose an individual with a specific occupational illness. X-ray evidence of coal dust exposure resembles multiple non-occupational diseases, so any abnormalities must be "clinically correlated" through other forms of testing. J.A. 889–93.

In 2000, Adams received a NIOSH x-ray and was later informed by the Mine Safety and Health Administration (MSHA) that the B-reader found evidence of Category 1 coal workers' pneumoconiosis (CWP). CWP, known colloquially as "black lung," is a latent occupational disease marked by fibrosis, or scarring, of the lungs and caused by inhalation of coal dust. It can take years of coal dust exposure for CWP to develop, and it progresses slowly once it occurs. The disease progresses through three stages of simple CWP—beginning with Category 1 and advancing to Category 3—followed by three stages of complicated CWP—beginning with Category A and ultimately becoming Category C.

Adams received another NIOSH x-ray in 2006 and was sent a letter indicating the B-reader found "DEFINITE EVIDENCE of CATEGORY 1 PNEUMOCONIOSIS." J.A. 56. MSHA letters that Adams received in 2000 and 2006 advised him to contact a doctor

---

[2] B-readers are physicians who have passed a NIOSH-approved test demonstrating their ability to "interpret[] chest radiographs for pneumoconiosis and other diseases." 42 C.F.R. § 37.52(b)(2).

and informed him that he was eligible to transfer to a less dusty area of the mine. At that time, Adams felt "wide open healthy and wasn't having any problems," so he declined to transfer positions. J.A. 558. But in 2007, he decided to visit Dr. Mahmood Alam for further evaluation.[3] Dr. Alam performed a CT scan and pulmonary function testing, which led him to conclude that NIOSH's findings could not be clinically correlated. Dr. Alam did not diagnose Adams with CWP, because he believed at the time that Adams's abnormal x-ray results were caused by calcified granulomas on his lungs.

In 2009, Adams was again screened by NIOSH and received another letter informing him that his x-ray revealed "DEFINITE EVIDENCE OF CATEGORY 1 PNEUMOCONIOSIS." J.A. 67–68. He visited Dr. Alam for a second time and received another CT scan and round of pulmonary function testing. J.A. 1220–21. Based on those results, Dr. Alam continued to believe Adams had calcified granulomas, rather than CWP. J.A. 960.

Between 2010 and 2011, various doctors treated Adams for shortness of breath. In 2010, Adams's primary care physician, Dr. April Hall, placed him on an albuterol inhaler to help with symptoms of "obstructive lung function." J.A. 1074.[4] In 2011, Adams continued to experience shortness of breath along with chest pain, so Dr. Hall referred him to a cardiologist, Dr. Jose Velazquez. Dr. Velazquez did not find any coronary artery

---

[3] As discussed below, Dr. Alam subsequently became an expert witness for Adams in this case.

[4] Defendants' expert, Dr. James Lockey, believes that Adams may have also suffered from allergies and asthma during this time period.

diseases and suggested his difficulty breathing might be caused by an underlying lung disease. However, medical records from this period also suggest Adams had hypertension, which could have contributed to his symptoms. Adams was also referred for a sleep study in 2011, after which he was diagnosed with severe obstructive sleep apnea. Pulmonary function testing ordered in 2011 revealed "no airflow obstruction." J.A. 1332.

Adams received a third x-ray from a non-NIOSH provider on October 25, 2012. The reviewing physician reported that the "[i]nterstitial process in the lungs [was] slightly more impressive than on January 14, 2007[,] consistent with coalworkers pneumoconiosis silicosis. Findings appear worse than on previous study." J.A. 1249. A subsequent x-ray performed on August 13, 2013 showed that this "interstitial process in the lungs [was] worse than October 25, 2012." J.A. 1250. Pulmonary function tests in 2013 also indicated a "[m]oderate restriction" of Adams's lung function. J.A. 999–1000.

Up to this point, Adams's medical records consistently listed CWP as one "differential diagnosis" explaining his pulmonary symptoms.[5] However, Adams was not formally diagnosed with CWP between 2000 and 2013. During this time, medical professionals also considered whether his symptoms could be caused by allergies, asthma, chronic bronchitis, granulomas, hypertension, or sleep apnea.

---

[5] A differential diagnosis is a collection of illnesses that a doctor believes could plausibly be causing a patient's symptoms. As Dr. Alam testified at his deposition, CWP will always be part of the differential diagnosis for someone with Adams's occupational history.

6

On October 2, 2014, Adams was diagnosed for the first time with Category B complicated CWP—the fifth stage of the disease—after a chest x-ray revealed significant "opacities" and "distortion" in his lungs. J.A. 1421–23. By the time Adams was officially diagnosed with CWP, he struggled to walk uphill, coughed regularly, and experienced chest pain and wheezing with exertion.

Today, Adams is unable to play with his grandchildren, walk the seventy-five feet across his property, or shower without breathing problems. Dr. Alam testified that he is a potential candidate for a lung transplant.

B.

Adams filed suit in Virginia state court on September 29, 2016, three days shy of the two-year anniversary of his diagnosis. His complaint alleged that Defendants' respirators were defectively and negligently manufactured, breached implied warranties, and violated federal regulatory requirements. Adams requested compensatory damages greater than $75,000 and punitive damages greater than $20 million. Defendants 3M (since dismissed) and AO removed the case to the Western District of Virginia on the basis of the court's diversity jurisdiction.

Following discovery, Defendants moved for summary judgment, arguing that Adams filed this suit outside the limitations period. At the summary judgment hearing on May 17, 2019, the district court stated its understanding that Virginia's two-year statute of limitations for personal injury claims runs from the date an injury is received, rather than the date it is discovered. Because Adams filed suit on September 29, 2016, he would need

7

to have not only discovered, but also contracted CWP *after* September 29, 2014, to avoid being time-barred.

At the summary judgment hearing, Adams conceded that he was diagnosed with complicated CWP on October 2, 2014, and that it would not be possible for him to have first developed CWP just three days earlier, on September 29, 2014. After the district court questioned how this suit could be timely, Adams urged the court to treat his October 2, 2014 diagnosis as the date on which the limitations period began to run, because that was the first time a medical professional "pinpointed" the existence of the disease. J.A. 1644–45.

In a written order, the district court granted Defendants' motions for summary judgment. The court found that undisputed facts in the record proved CWP is a slow-developing disease that could not progress from simple to complicated in the three days between September 29, 2014 and October 2, 2014. Additionally, medical evidence established that Adams developed CWP prior to 2014.[6] The court therefore concluded that there was no genuine dispute that Adams first suffered CWP outside the limitations period.

---

[6] Adams and Defendants directed the district court to a number of Adams's medical records. They also provided the district court with the depositions of Adams and two expert witnesses—Dr. Lockey for Defendants and Dr. Alam for Adams. Dr. Alam and Dr. Lockey reviewed Adams's medical records and concluded that Adams developed CWP well before 2014. Dr. Alam also provided unrebutted testimony that CWP is a "slow, progressive disease." J.A. 989.

8

## II.

### A.

This Court reviews the district court's order granting summary judgment de novo. *Dash v. Mayweather*, 731 F.3d 303, 310 (4th Cir. 2013). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether there is a genuine dispute of material fact, a court must "construe the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party." *Dash*, 731 F.3d at 311.

Only those facts that could determine the outcome of a case are considered material, *see Erwin v. United States*, 591 F.3d 313, 320 (4th Cir. 2010), and only genuine disputes about those facts can defeat summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute requires evidence that could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "The mere existence of a scintilla of evidence" does not create a genuine dispute of material fact. *Id.* at 252. The record must instead permit the conclusion that "reasonable minds could differ" on the issue. *Bouchalt v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting *Anderson*, 477 U.S. at 250).

### B.

Because this case was originally brought in Virginia state court and removed to federal court on the basis of diversity jurisdiction, "we interpret and apply the substantive

law" of Virginia. *Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 646 (4th Cir. 2004) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). The substantive law of Virginia includes both statutes and the decisions of the Commonwealth's highest court interpreting those statutes. *See Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416–17 (4th Cir. 1992) (en banc). This Court treats Virginia's statute of limitations as substantive when reviewing diversity cases. *See Joyce v. A.C. & S., Inc.*, 785 F.2d 1200, 1203 (4th Cir. 1986).

Two Virginia statutes guide our resolution of this appeal. The first—Va. Code Ann. § 8.01-243(A)—governs the statute of limitations for personal injury *causes of action*. Under section 8.01-243(A), "[u]nless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery, . . . shall be brought within two years after the cause of action accrues." Va. Code Ann. § 8.01-243(A). The second statute—Va. Code Ann. § 8.01-230—governs the accrual of *rights of action*. Under that provision:

> In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person . . . *and not when the resulting damage is discovered*, except where the relief sought is solely equitable or where otherwise provided . . . .

Va. Code Ann. § 8.01-230 (emphasis added).

We start our analysis by examining the distinction between a "cause of action" and a "right of action" under Virginia law. *See First Va. Bank-Colonial v. Baker*, 301 S.E.2d 8, 13 (Va. 1983) ("This is a distinction *with* a difference."). "[A] cause of action is a set of operative facts which, under the substantive law, may give rise to a right of action." *Roller*

10

*v. Basic Constr. Co.*, 384 S.E.2d 323, 326 (Va. 1989). By contrast, a right of action "is the remedial right accorded to that person to enforce a cause of action . . . [that] arises only when that person's rights are infringed." *Id.* The cause of action does not accrue until the plaintiff suffers an injury such that it "has thus ripened into a right of action." *Id.* However, the two are not indistinguishable, and one cause of action based on the same breach of a plaintiff's legal rights may produce separate harms that "give rise to separate rights of action that accrue at different times." *Kiser v. A.W. Chesterton Co.*, 736 S.E.2d 910, 915 (Va. 2013).

This distinction has important consequences for the statute of limitations in cases such as this one, which involve latent diseases caused by a plaintiff's exposure to harmful substances. Virginia courts interpret "injury" under section 8.01-230 to require "positive, physical[,] or mental hurt to the claimant, not legal wrong to him." *Locke v. Johns-Manville Corp.*, 275 S.E.2d 900, 904 (Va. 1981). The Virginia Supreme Court has thus recognized that a plaintiff's cause of action in a latent disease case does not accrue on the date of exposure, but instead on the date a plaintiff develops the disease, and thereby acquires the injury giving that plaintiff a right of action. *Id.* at 904–06.

While a disease might occur after a plaintiff's exposure to a harmful substance, it might also occur before it is discovered. Virginia courts have repeatedly explained that a plaintiff's cause of action accrues on the actual date of injury, not the date on which that injury is discovered by or communicated to the plaintiff. *See Lo v. Burke*, 455 S.E.2d 9, 13 (Va. 1995); *Comptroller of Va. ex rel. Va. Mil. Inst. v. King*, 232 S.E.2d 895, 900 (Va. 1977); *Locke*, 275 S.E.2d at 905–06. *But see Kiser*, 736 S.E.2d at 915 (discussing a specific

11

exception to this rule for asbestos-related illnesses). This rule creates obvious difficulties for plaintiffs proceeding under section 8.01-243(A) who develop an illness that does not produce obvious or identifiable symptoms for the first two years. Regardless, a plaintiff is vested with a cause of action as soon as the plaintiff *has* an illness, even if the plaintiff lacks symptoms. *See Locke*, 275 S.E.2d at 905; *Lo*, 455 S.E.2d at 13. Under Virginia law, any "difficulty in ascertaining the existence of a cause of action is irrelevant." *Comptroller of Va.*, 232 S.E.2d at 900.

Creeping diseases, such as CWP, present the additional complication that they can produce "successive" injuries, *Joyce*, 785 F.2d at 1204–05, each of which vests a plaintiff with a new remedial *right* of action, *see Kiser*, 736 S.E.2d at 915–17. Despite the language of section 8.01-230, these new rights of action do not reset the two-year statute of limitations under section 8.01-243(A). In Virginia, when more than one right of action stems from the same underlying breach of a plaintiff's legal right, those rights of action form part of an indivisible cause of action. *Id.* at 916–17. "The running of the limitations period [for that cause of action] will not be tolled by the fact that the . . . substantial damages did not occur until a later date." *Shipman v. Kruck*, 593 S.E.2d 319, 323 (Va. 2004). This Court accordingly interprets Virginia law to bar suits based on the development of a serious illness when some earlier, more marginal injury already vested the plaintiff with a cause of action more than two years prior. *See Joyce*, 785 F.2d at 1203–05.

Finally, we pause to consider how courts resolve statute of limitations defenses under Virginia law. A defendant must prove by "competent evidence 'that pinpoints the precise date of injury with a reasonable degree of medical certainty'" that a plaintiff's suit

12

was filed outside the limitations period. *Lo*, 455 S.E.2d at 12 (quoting *Locke*, 275 S.E.2d at 905). In creeping-disease cases, this Court has held that a defendant need only prove that the plaintiff's first injury was received outside the limitations window rather than the specific date of injury. *See, e.g.*, *Large v. Bucyrus-Erie Co.*, 707 F.2d 94, 97 (4th Cir. 1983) ("The illnesses complained of by plaintiff do not arise at a given point in time; instead, they result over a period of time, the beginning being unknown.").

III.

On appeal, Adams argues that the district court failed to properly consider evidence concerning the onset of his occupational injury and erred in interpreting the applicable statute of limitations. Although Adams's evidence might create genuine disputes about specific factual assertions made by Defendants, there is no genuine dispute about the only material question in this case: whether Adams first developed a respiratory illness outside the limitations period. Nor, for the following reasons, did the district court incorrectly interpret Virginia's statute of limitations. This Court is therefore obligated to affirm the district court's grant of summary judgment.

A.

Adams first argues that the district court incorrectly applied the summary judgment standard by improperly weighing or excluding multiple pieces of evidence in the record. Those claims are summarized as follows:

*First*, Adams claims the district court erred in basing his summary judgment ruling on Dr. Alam's deposition testimony that "as of 2007 or 2009 . . . Mr. Adams had some degree of CWP scarring in his lungs." *See* J.A. 1141. Adams disputes his expert's opinion, which was based on Dr. Alam's retrospective review of Adams's full medical history. Adams argues that the CT scans Dr. Alam performed in 2007 and 2009 only revealed the existence of granulomas on his lungs, which are not caused by CWP.

*Second*, Adams argues that the district court should have excluded the testimony of Dr. Alam about the conclusions of NIOSH B-readers, because Dr. Alam is not himself a B-reader. Adams similarly believes the Court did not give sufficient weight to Dr. Lockey's testimony, which casts doubt on the B-readers' findings of Category 1 simple CWP. Adams also generally disputes the inclusion of NIOSH's conclusions in the court's factual findings, given that these exams were non-diagnostic.

*Third*, Adams contends that the district court improperly attributed the "[m]oderate restriction" revealed by his 2013 pulmonary function testing to occupational illness. *See* J.A. 999–1000. He believes this conclusion—which is based on Dr. Alam's deposition testimony—is disputed, given Dr. Alam's prior belief that Adams may have suffered from pneumonia as well as Dr. Lockey's expert opinion that Adams might also have asthma and allergies. Previous doctors had also considered whether hypertension and sleep apnea were to blame for his shortness of breath.

*Fourth*, Adams believes the district court gave "undue weight" to the consistent inclusion of CWP as part of the differential diagnosis and patient history in his medical records. Opening Br. at 17. Adams stresses that a differential diagnosis is merely "a list

of diagnostic possibilities being considered by a healthcare provider," and therefore cannot prove he had CWP on a particular date absent clinical correlation. *Id.*

Even if this evidence creates genuine disputes about specific medical findings in the record, Adams's arguments mistake the nature of the dispute before the Court. As the district court correctly held, the only issue to be resolved on summary judgment was whether Adams developed CWP at some point prior to September 29, 2014—the earliest date on which he could have developed the disease without time-barring his September 29, 2016 suit. The district court's framing of the dispute is compelled by two opinions of this Circuit holding that defendants meets their burden under Virginia's statute of limitations by proving that a slow-developing disease, like CWP, first manifested itself outside the statute of limitations, even if the exact date of injury is unclear. *Large*, 707 F.2d at 97; *Joyce*, 785 F.2d at 1205.[7]

Accordingly, so long as some undisputed evidence proves to a reasonable degree of medical certainty that Adams developed CWP prior to September 29, 2014, any disputes

---

[7] These prior opinions may be in some tension with the language of the Virginia Supreme Court in *Locke*, given its requirement that the defendant marshal evidence that "pinpoints *the precise date of injury* with a reasonable degree of medical certainty." 275 S.E.2d at 905 (emphasis added). However, *Large* and *Joyce* were both decided after *Locke*, and this Court's panel in *Large* explicitly interpreted *Locke* to only require proving the pre-limitations onset of a creeping disease. *Large*, 707 F.2d at 97; *see also St. George v. Pariser*, 484 S.E.2d 888, 891 (Va. 1997) ("To carry his burden on the limitations plea, therefore, [the defendant] was required to show, with reasonable medical certainty, that this injury . . . occurred prior to October 21, 1991."). The Virginia Supreme Court has not corrected this Court's interpretation of state law, and we are not at liberty to overturn these earlier panels' published opinions. *See Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998).

15

over the significance of specific pieces of medical evidence are not material. And there is no genuine dispute that Adams developed CWP outside the limitations period. Adams's own expert, Dr. Alam, testified that "usually black lung is a very slow, progressive disease [developing over a] 10, 15 year period." J.A. 989. According to Dr. Alam, even in rare, accelerated cases of the disease, it develops over five years. CWP "never occurs overnight." J.A. 1026. On October 2, 2014, Adams was diagnosed with Category B complicated CWP. As NIOSH letters received by Adams explain, CWP progresses through three stages of simple CWP, followed by three stages of complicated CWP. This means that his disease not only progressed beyond the first stage of complicated CWP, but also progressed through the three initial stages of *simple* CWP. To fall within the limitations period, this must have occurred in three days, which Adams's own counsel plainly conceded during the summary judgment hearing did not happen. Although the district court is required to make all *reasonable* inferences in favor of the plaintiff, *Dash*, 731 F.3d at 311, it would be unreasonable to infer based on this testimony that Adams's CWP developed within the limitations period. No reasonable jury could conclude otherwise, and therefore summary judgment is appropriate. *See Anderson*, 477 U.S. at 248.

Second, both Dr. Alam and Dr. Lockey testified that Adams developed CWP prior to September 29, 2014, and both experts examined similar medical evidence in reaching that conclusion. Dr. Alam testified that Adams had suffered some form of occupational lung disease by 2009. Importantly, Dr. Alam testified that Adams's 2012 x-ray, which showed "interstitial process in the lungs, slightly more impressive than January 14, 2007" reflected a worsening of already existing CWP. J.A. 1093–94. Therefore, Dr. Alam

16

believes Adams's 2013 x-ray revealed the further development of CWP-associated nodules on his lungs.[8] Dr. Alam also testified that Adams's 2013 pulmonary function testing—which indicated moderate lung restriction—was caused by exposure to coal dust.

Similarly, Dr. Lockey testified that Adams had developed CWP by 2010 or 2011. He based this conclusion on his review of Adams's x-rays, which appeared relatively normal prior to 2010, but which showed abnormalities by 2012. Also relevant to his analysis was a review of Adams's pulmonary function test results, which worsened between 2007 and 2018 at five times the normal rate due to aging, and which he concluded were primarily driven by CWP, not asthma.

In light of this evidence, there is no genuine dispute of material fact that Adams's CWP first manifested itself before September 29, 2014. The only potential material dispute created by Adams's evidence concerns Dr. Alam's conclusion that Adams's 2013 pulmonary function test reflected the existence of CWP. It is true both that Dr. Lockey testified that Adams could suffer from asthma and that doctors previously diagnosed him with sleep apnea and hypertension prior to his 2013 testing. Dr. Lockey, however, explicitly testified that CWP, not asthma, was responsible for Adams's decline in pulmonary function between 2007 and 2018.[9]

---

[8] Adams argues that x-rays can never be used to diagnose CWP. Therefore, without clinical correlation, these x-rays do not prove the existence of the illness. However, given that Adams's October 2, 2014 diagnosis is undisputed, these x-rays simply serve as evidence of the progression of a disease both parties already agree he has.

[9] Adams similarly argues that a pulmonary function test revealed normal diffusion capacity in 2007 and that the district court improperly relied on a 2011 finding by Dr.

Further, Dr. Lockey and Dr. Alam had the benefit of retroactively reviewing Adams's full medical history when forming their opinions. Based on their knowledge that Adams does in fact have CWP, the experts were able to interpret Adams's earlier symptoms and test results—including his 2013 pulmonary function test—as evidence of his developing CWP. The fact that earlier doctors could not have known his eventual diagnosis when exploring other causes of Adams's poor lung function does not create a genuine dispute as to the consistent medical opinion delivered by the experts in this case: Adams had CWP prior to September 29, 2014.

B.

Adams also makes a series of arguments urging this Court to reinterpret Virginia's statute of limitations rule to forbid the hindsight review conducted by the experts. Adams contends that because CWP is a latent disease that changes the body in nonobvious ways, it could not be diagnosed until the larger opacities and distortions revealed themselves in Adams's 2014 x-ray. Without the advantage of retroactive review and knowledge of his diagnosis, Dr. Alam and Dr. Lockey would not have been able to conclude that Adams's pre-2014 symptoms and test results were caused by CWP. Adams claims that Defendants have thus improperly "bootstrap[ped]" the experts' post-2014 opinions onto pre-2014

Velazquez that Adams's breathing was marked by "diffuse bronchi and dry crackles." J.A. 1081–82. However, this evidence cannot create a genuine, material dispute that Adams developed CWP before 2014, in light of expert testimony about Adams's later x-rays in 2012 and 2013 as well as his 2013 pulmonary function tests.

18

medical evidence that could not, itself, have demonstrated the existence of CWP to a reasonable degree of medical certainty. Opening Br. at 24–25.

Ultimately, Adams argues the district court erred by permitting Defendants to pinpoint the existence of CWP *retrospectively* by means of expert opinion. Such a rule raises serious fairness concerns because it places Adams in a bind—his cause of action accrued and expired well before sufficiently unambiguous injuries gave him a provable right of action. Adams therefore argues that Virginia's statute of limitations rule instead sets October 2, 2014—the date of his diagnosis—as the date on which his cause of action accrued, because it was the first time his illness was pinpointed to a reasonable degree of medical certainty as having occurred.

However, Adams's interpretation of Virginia law resembles the sort of discovery rule that was explicitly rejected by Virginia's General Assembly and that Virginia courts have consistently declined to read into the statute of limitations. *See, e.g.*, *Comptroller of Va.*, 232 S.E.2d at 900 ("We have followed the general rule that the applicable period of limitation begins to run from the moment the cause of action arises rather than from the time of discovery of injury . . . ."); *Lo*, 455 S.E.2d at 13; *Locke*, 275 S.E.2d at 905–06. Therefore, in creeping-disease cases, a cause of action may accrue—and trigger the statute of limitations—before a disease "manifests itself by symptoms, since it is the onset of the disease itself that triggers the running of the limitation period." *Lo*, 455 S.E.2d at 13.

Adams is correct that Virginia law requires proving the onset of a disease with "competent evidence 'that pinpoints the precise date of injury with a reasonable degree of medical certainty.'" *Id.* at 12 (citing *Locke*, 275 S.E.2d at 905). However, because a

19

plaintiff can have a cause of action before developing symptoms, it logically follows that a defendant may pinpoint the date of injury retrospectively to a time before symptoms developed. As the court in *Locke* recognized, "expert medical testimony will [sometimes] demonstrate the injury occurred weeks, months[,] *or even years* before the onset of symptoms. Thus, the cause of action would accrue and the limitations period would run from the earlier and not the later time." 275 S.E.2d at 905 (emphasis added); *see also Large*, 707 F.2d at 97 (relying on expert testimony to retrospectively establish the date of injury). Adams's insistence that we instead treat the date of his diagnosis as the accrual date conflates *Locke*'s requirement that an injury must occur for a cause to accrue with the requirement for how that injury must be proven. Instead, Virginia law plainly states that an injury can and sometimes will exist before it is discovered.

Adams's briefing suggests that Virginia's statute of limitations cannot be this harsh, because it would place him in an absurd dilemma. However, the Virginia General Assembly's actions subsequent to the *Locke* decision suggest this outcome is intended by the General Assembly, even if it produces unfair results. The Virginia Supreme Court's 1981 decision in *Locke* reaffirmed the Commonwealth's no-discovery rule and noted that any change to that rule "must be accomplished by the General Assembly." 275 S.E.2d at 905–06. In response, the General Assembly explicitly created an exception to the no-discovery rule: four years after the *Locke* decision, the General Assembly amended Va. Code Ann. § 8.01-249 to create a discovery rule for asbestos-related diseases. *See* Va. Code Ann. § 8.01-249(4) ("In actions for injury to the person resulting from exposure to asbestos . . . [an action accrues when the] disease is first communicated to the person or his

20

agent by a physician."); *see also Kiser*, 736 S.E.2d at 915 (discussing this amendment). Thus, the legislature has declined to make Adams's claims subject to a discovery rule after *Locke*, despite doing so for a similar disease. Under Virginia law, this constitutes legislative acquiescence to and approval of that interpretation. *Cygnus Newport-Phase 1B, LLC v. City of Portsmouth*, 790 S.E.2d 623, 627 (Va. 2016); *see also Lee-Thomas v. Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 254 (4th Cir. 2012) (applying state law doctrine of acquiescence when interpreting a state statute).

Finally, our conclusion is further compelled by Virginia's statutory scheme, which creates an indivisible cause of action for all rights of action that stem from a defendant's breach. *See* Va. Code Ann. § 8.01-243(A) ("[E]very *action* for personal injuries . . . shall be brought within two years after the *cause of action* accrues." (emphasis added)); *Kiser*, 736 S.E.2d at 916–17. As discussed above, Adams's cause of action accrued as soon as he suffered even the slightest injury caused by the inhalation of coal dust. His later development in 2014 of larger opacities and distortions in his lungs gave him a new right of action to remedy these new harms. However, as discussed above, this new or worsening injury did not vest him with a new cause of action that reset the statute of limitations. *See Joyce*, 785 F.2d at 1204–05. Just as it did with the Commonwealth's discovery rule, Virginia's General Assembly appears to have modified the indivisible cause of action rule for asbestos-related illnesses. *See* Va. Code Ann. § 8.01-249(4) ("The diagnosis of a nonmalignant asbestos-related injury or disease shall not accrue an action based upon the subsequent diagnosis of a malignant asbestos-related injury or disease . . . ."). By leaving an indivisible cause of action in place for other diseases, including CWP, the legislature

21

has acquiesced to the Virginia Supreme Court's consistent holding that the eventual development of more significant injuries does not provide plaintiffs like Adams with a new cause of action. *See Cygnus Newport-Phase 1B, LLC*, 790 S.E.2d at 627. Accordingly, this Court is bound to affirm the district court's correct conclusion that the limitations period did not begin to run on October 2, 2014, the date Adams first discovered he had CWP.

IV.

In reaching this conclusion, we would be remiss in remaining silent about the manifest unfairness that it poses to plaintiffs, like Adams, who suffer from latent diseases that cause ambiguous symptoms for the first two years or successive harms that fall outside the limitations window. We therefore join other state and federal courts in recognizing that Virginia law essentially bars certain plaintiffs from recovery. *See, e.g.*, *Joyce*, 785 F.2d at 1205 ("[T]his rule may effectively preclude recovery for serious injuries . . . . [I]ts result may be harsh when applied to asbestos-related or other 'creeping disease' cases . . . ."); *Comptroller of Va.*, 232 S.E.2d at 900 ("The inequities that may arise from the general rule which may trigger a statute of limitations when the injury or damage is unknown or difficult or even incapable of discovery are apparent.").

Adams is faced with a catch-22 from which Virginia law provides no escape. If he brought his claims within the two-year statute of limitations, he would have been unable to prove them, because doctors at the time had not clinically correlated his symptoms with CWP. Now that he can prove his injuries were caused by the inhalation of coal dust, the

claims are barred by Virginia law. It is difficult to imagine how any miner could bring a personal injury claim based on black lung, given that it will likely remain hidden or at least ambiguous throughout the two-year limitations window. Today, Adams struggles with the most basic activities of life, but he lacks any ability to remedy his injuries.

Perhaps at trial, Defendants would have shown that their respirators were not responsible for the serious harm that has befallen Adams. But Virginia law has deprived Adams of the ability to test the evidence in this case. The Commonwealth's statute of limitations operates as a "get-out-of-jail-free" card that guarantees Adams and those like him will never get their day in court. Given the state legislature's refusal to change that law in the face of numerous opinions spelling out its harsh consequences for those in Adams's shoes, this Court can only conclude the law does so by design, not by mistake. We are obligated to apply the Commonwealth's statute of limitations as it is, not as we would like it to be. The district court's judgment is accordingly

*AFFIRMED*.